Samuel **LUCAS, and Belle Lucas, his wife, in their own names and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**FLORIDA POWER & LIGHT COMPANY, a Florida Corporation, Defendant.**

No. 77–4009–Civ–SMA.

United States District Court, S.D. Florida.

Oct. 31, 1983.

Wallace, Engels, Pertnoy & Solowdky, Miami, Fla., Macey & Sikes, Atlanta, Ga., for plaintiffs.

Steel, Hector & Davis, Miami, Fla., Reid & Priest, New York City, for defendant.

## MEMORANDUM OPINION

ARONOVITZ, District Judge.

*Containing Findings of Fact and Conclusions of Law*

THIS CAUSE was heard by the Court at a non-jury trial extending over the course of eight days. By Order dated November 10, 1982, the Court bifurcated the trial so that only liability issues were presented. Numerous witnesses testified, depositions were introduced into evidence, many exhibits were admitted, and the Court heard extensive oral argument by counsel for both parties, receiving and considering also pretrial memoranda of law and post-trial revised proposed findings of fact and conclusions of law from both sides. The Court has had ample opportunity to hear and observe the lay witnesses, the business-oriented witnesses, the parties and their representatives, as well as expert witnesses on both sides. Having fully considered all of the aforegoing, the Court record, and being otherwise fully advised in the premises, the Court hereby renders this Memorandum Opinion thereon, including herein its Findings of Facts and Conclusions of Law as follows:

(Exhibits are referred to as: "PX–...." for Plaintiffs' Exhibits, and "DX–...." for Defendant's Exhibits herein;

Citations to trial testimony will contain the witness's last name and the transcript page number herein.)

### Nature of the Action

This is a class action by Samuel Lucas and Belle Lucas, his wife, Florence Anthone and Anchor National Life Insurance Company, on behalf of themselves, and all persons who beneficially owned Defendant's first mortgage bonds, 10⅛% series [issued *March 13, 1975*, due *March 1, 2005* ] immediately prior to Defendant's redemption announcement made on March 23, 1977. Plaintiffs contend that Defendant, Florida Power & Light Company (hereinafter referred to as "FPL"), in 1975, through its public invitation for bids, preliminary, bidding and final prospectuses for the bonds, violated the Securities Exchange Act of 1934, specifically, Section 10(b) and Rule 10b–5, in that Florida Power and Light fraudulently misrepresented therein its right to redeem the bonds at special redemption prices through the replacement fund provisions of the mortgage; that, at or about the time of redemption in 1977 and in connection therewith, FPL's conduct constituted fraud in violation of Section 10(b) and Rule 10b–5.

### Basis of Federal Jurisdiction

Plaintiffs' complaint arises from alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder. This Court has jurisdiction over this

action under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

### Findings of Fact

1. On March 13, 1975, FPL sold $125 million (principal amount) of first mortgage bonds to a group of 21 underwriters which submitted the winning bid for the entire issue of bonds. It was intended that the bonds be acquired by the underwriters with a view to distribution to the public.

2. The interest rate on the bonds was fixed by the winning bid at 10⅛%. (See PX–75) This was the highest interest rate historically paid by FPL up to that time for first mortgage bonds which were issued and sold. The 10⅛ bonds were to be offered for resale to the public at a price of 101.663% of par value and accrued interest.

3. In addition to the basic mortgage and the supplemental indenture, the 10⅛ bonds were sold at competitive bid pursuant to certain documents. Those documents are:

   (a) Preliminary prospectus, dated February 12, 1975; (DX–2)

   (b) Bidding prospectus, dated March 7, 1975; (DX–3)

   (c) Public invitation for bids and statement of terms and conditions of bid, dated March 10, 1975; (DX–4) and

   (d) Final prospectus, dated March 13, 1975. (PX–75)

4. Florence Anthone purchased ten of the 10⅛ bonds, $1,000.00 denomination, on March 14, 1975, at a price expressed in terms of percentage of par value of 101.-663, for a total of $10,166.30. Although she received prospectuses for her investment, plaintiff Anthone never read any FPL prospectus or other description of the 10⅛ bonds before she purchased the 10⅛ bonds on March 14, 1975. (Anthone, Tr. 66–67) She relied completely on her late husband's broker's decision.

5. Samuel and Belle Lucas purchased ten of the 10⅛ bonds, $1,000.00 denomination, on February 14, 1977, at a price expressed in terms of percentage of par value of 111.75, for a total of $11,175.00. Samuel Lucas did not possess or read any FPL prospectus describing the 10⅛ bonds before he purchased the 10⅛ bonds on February 14, 1977 in the after market. Instead, he relied on the assurance of a stockbroker that the bonds could not be called, and upon a *Bond Guide* prepared by Standard & Poor's, which his broker indicated confirmed this. (Lucas, Tr. 57) He wanted bonds with no possible recall at all. (Lucas, Tr. 58)

6. Anchor National Life Insurance Company, (hereinafter referred to as "ANLIC"), purchased the 10⅛ bonds on the dates and at the prices and amounts shown below:

| Date | Face Amount | Price | Cost |
|---|---|---|---|
| 05/20/76 | $1,000,000 | 106.250 | $1,062,500.00 |
| 07/13/76 | 750,000 | 107.000 | 802,500.00 |
| 08/10/76 | 2,000,000 | 107.667 | 2,153,340.00 |
| 09/02/76 | 2,000,000 | 109.625 | 2,192,500.00 |
| 09/10/76 | 500,000 | 110.500 | 552,500.00 |
| 01/06/77 | 30,000 | 111.427 | 33,428.10 |
| Totals | $6,280,000 | | $6,796,768.10 |

Plaintiff ANLIC's purchases of bonds were made for it by its affiliated investment adviser, Anchor Corporation. The officer of Anchor Corporation supervising bond purchases was also an officer of ANLIC, and was at the time of suit a Senior Vice President of ANLIC. In selecting the 10⅛ bonds in the after market of May 1976, ANLIC relied first on conversations with Smith Barney, then on a *Moody's* publication, then on a Paine, Webber booklet on the redemption features of high coupon bonds, and on *Standard & Poor's Bond Guide*. ANLIC did not read or rely on prospectuses when buying bonds in the after market (Harbeck, Tr. 1219, 1238).

### The FPL Mortgage

7. FPL's basic mortgage and original series of bonds were authorized by the Securities and Exchange Commission (SEC) in its Findings and Opinion, and Order, *In re Florida Power & Light*, 15 S.E.C. 85, 96 (SEC Release 35–4791, December 28, 1943). (DX–21)

8. At the time the mortgage was created, FPL, like many other utilities, was subject to the Public Utility Holding Company Act of 1935 (the "1935 Act"). (Dicke, Tr. 1639) The 1935 Act gave the SEC regulatory jurisdiction concerning the organization and financing activities of public utility holding companies and their operating subsidiaries.

9. The 1935 Act was enacted in the aftermath of a large number of bankruptcies and defaults by utilities during the Depression. Pursuant to the 1935 Act, the SEC began a process of reorganizing the holding company systems and providing a more rational basis for their financing. (Dicke, Tr. 1639)

10. During the period from 1937 through 1945, a large number of public utility mortgages were executed under the authorization of the SEC. These mortgages are substantially similar to one another. (Dicke, Tr. 1640)

11. As a Florida mortgage, FPL's mortgage, and all the supplemental indentures thereto, are recorded in the official public records of the 37 counties in which FPL owns property.

12. The mortgage here authorized an initial series of bonds and secured them by placing a lien on all property (with certain specified exceptions) which FPL owned at that time and which it thereafter would acquire or construct. (FPL Mortgage, DX–20)

13. The mortgage provided that the company could thereafter issue new series of first mortgage bonds. Each time the company issues a new series, the mortgage requires it to designate, or "certify", a quantity of property in connection with that series. The principal amount of the bonds may not exceed 60% of the cost or value of the certified property. FPL's ability to finance by selling first mortgage bonds is limited by the amount of fundable property available.

14. Each time FPL sells first mortgage bonds, it executes a supplemental indenture, which establishes terms and conditions under which the specific issue of bonds is offered. The supplemental indenture also serves to certify the property on which the new bonds are issued. The supplemental indenture relating to the 10⅛ bonds was the 30th Supplemental Indenture. (DX–5)

*Replacement Fund*

15. In its order authorizing the FPL mortgage, the SEC required FPL to include in that mortgage a covenant which imposed an annual requirement hereafter referred to as a "replacement fund" requirement. The covenant in the order reads as follows:

The *Company* further covenants, in substance, that during the year 1944 and in each succeeding year thereafter it will expend an amount equivalent to 15% of adjusted gross operating revenues, as defined in the Indenture, for such year for maintenance and replacement of the mortgaged property, for the construction of property which may not thereafter be made the basis for the authentication of bonds, *or for* the redemption or purchase and *cancellation of bonds* (but not including bonds retired pursuant to the sinking fund provisions), *any deficiency* in such expenditure to be *made up by the deposit of cash with the Corporate Trustee as a maintenance and replacement fund.* The annual amount equivalent to 15% of adjusted gross operating revenues to be so expended shall, however, be not in excess of (a) $2,000,000, plus (b) actual expenditures for maintenance, plus (c) 2½% of gross retirements of depreciable property subsequent to December 31, 1943. (Emphasis added.) (DX–21)

16. The replacement fund provisions of the mortgage require that FPL file an Officer's Certificate of Replacements (DX–134) with the corporate trustee of the mortgage within 90 days of the close of the calendar year. (DX–20; FPL Mortgage Article VIII, Section 39, p. 136) The Officer's Certificate must state the prior year's financial results, including revenues and property owned at the year end. The formula gen-

erating the replacement fund requirement is essentially the lesser of either 15% of FPL's gross revenues or 2½% of the cost of FPL's depreciable property. *Id.* at p. 136, Section 39(I)(2).

17. The Officer's Certificate must set forth the manner in which FPL complies with the replacement fund requirement for the preceding year. If actual maintenance expenditures during that year were less than the amount of the requirement, FPL must make up the difference (the "deficiency") by electing to use one or a combination of specified items as credits against the deficiency. One election available to FPL is to "certify" property by delivering to the mortgage trustee a certificate setting forth the cost or value of designated property. Among other options, FPL may elect to deposit cash with the trustee, which cash may then be used to redeem bonds of any series. [This Court has already ruled as a matter of law in dismissing Count II of the Complaint that FPL could either certify property to or deposit cash with the trustee (Docket No. 107). Since the redemption was not in violation of FPL's mortgage, it follows that only the adequacy of disclosure is in issue here and *not* the underlying right to redeem.]

18. Prior to the redemption herein, FPL has never redeemed any substantial amount of bonds issued under the mortgage by the use of cash deposited in the replacement fund by reason of a decision not to take credit for available property additions. Historically, it was the custom and usage among electric utilities that contributions to the maintenance and replacement funds be made in the form of improvements or additions to property and not by cash.

*SEC Policy*

19. Since the period following enactment of the 1935 Act, when most utility mortgages were created, the SEC has had well defined and commonly known policies concerning "free", or unrestricted, redeemability of utility bonds. These policies are reflected in the mortgages adopted during that period, including FPL's mortgage. Because their mortgages contain such provisions and numerous bonds sold subject thereto are still outstanding, utilities such as FPL which are no longer subject to the 1935 Act generally continue to adhere to the SEC policies. (Dicke, Tr. 1644–45; 1653–54)

20. The SEC initially adopted and continues to hold a policy favoring free redeemability of utility bonds. (Dicke, Tr. 1648)

21. The SEC codified its long-standing policy in a 1956 Policy Statement. (DX–22) In that Statement, the SEC recognized that a great number of series of utility bonds had been issued on the basis of the terms and conditions of mortgages created under the Commission's regulation and that these mortgages could not as a practical matter be changed.

22. The SEC Release codified the SEC's long-standing requirement that utility mortgages include "protective" provisions such as replacement fund provisions. The SEC described one such provision it had long required:

"The Obligor shall expend annually for property additions an amount which the Obligor has demonstrated to the Commission is a reasonable annual requirement for the replacement of the book cost of depreciable mortgaged property of the Obligor which amount shall be expressed in terms of a percentage of said bond cost. Such *annual expenditure requirement may be satisfied, in whole or in part, by expenditures for property additions* made in a previous period. *If the Obligor shall have failed to satisfy such annual expenditure requirement, the Obligor shall deposit cash with the Indenture Trustee to the extent of such deficiency; provided, however, that the amount of cash required to be deposited may be reduced by an amount equal to the principal amount of retired bonds".* (Emphasis added.)

Release No. 35–13105, February 16, 1956. (DX–22)

23. In 1970 FPL's bondholders amended the mortgage, changing the applicability of the replacement fund provisions so that when all bonds issued prior to July 1970 had been retired, there would no longer be any replacement fund requirement. However, so long as any of those earlier bonds were outstanding, the fund's requirements would continue to protect the security of all bonds even though the issues after 1970 were not, as such, entitled to the benefit of the replacement fund.

24. The SEC did not allow utilities under its jurisdiction to limit the redeemability of their bonds until the publication of a Holding Company Act Release (35–16369) on May 8, 1969, which permitted issuers to include in indentures with respect to new issues of long-term debt securities a provision prohibiting, for a period of not more than 5 years, the refunding of such securities by the issuance of other debt securities at lower interest costs. The commission stated that this modification of its redemption policy would not apply to the redemption of long-term debt securities for sinking funds, or to redemptions in connection with mergers, sales of properties or for other corporate purposes. (See Dicke, Tr. 1655; DX–23)

25. In its 35th Annual Report in 1969, the SEC stated that the five year refunding restriction which is now permitted would not apply to redemptions for "other corporate purposes". (DX–23) Such other corporate purposes include redemption for replacement fund provisions of utility mortgages. (Dicke, Tr. 1694)

26. As a result of the SEC Release, it became common for utilities to issue first mortgage bonds with a five year prohibition on refunding at general redemption prices, but with no prohibition on redemption at special redemption prices. (Dicke, Tr. 1661)

### FPL 10⅛ Bond—Final Prospectus

27. FPL's special redemption rights were based on common utility mortgage provisions. [As previously noted, the Court has already ruled that the redemp-

tion was not in violation of FPL's mortgage. It follows that *only* the adequacy of disclosure is in issue here, not the underlying right to redeem.] They were consistent with general SEC policies and were well known and understood. Since the adoption of the 1935 Act, many series of bonds had been sold by utilities, including FPL, subject to those rights. (Dicke, Tr. 1640–55)

28. FPL disclosed its right to redeem the 10⅛ bonds at special redemption prices on the cover of its prospectus, as follows:

"The New Bonds will be redeemable, in whole or in part, upon not less than 30 days' notice at the general redemption prices and, under certain circumstances, at the special redemption prices as described herein, provided that, prior to March 1, 1980, no redemption may be made at a general redemption price through refunding at an effective interest cost to the Company of less than 10.052% per annum. *Such limitation does not, however, apply to redemptions at a special redemption price for the replacement fund or with certain deposited cash or proceeds of released property.* The special redemption prices for the New Bonds are 101.67% of the principal amount through February 29, 1976 and decrease thereafter to 100% for the twelve months ending February 28, 2005. *See 'New Bonds—Redemption and Purchase of Bonds' herein."* (emphasis supplied)

(PX–75, page 1).

29. The section of the interior of the prospectus entitled "New Bonds—Redemption and Purchase of Bonds" stated:

"The New Bonds will be redeemable, in whole or in part, on at least 30 days' notice (a) at the special redemption prices set forth below for the replacement fund or with certain deposited cash and proceeds of released property, and (b) at the general redemption prices set forth below for all other redemptions; provided, however, that none of the New Bonds shall be redeemed at a general redemption price prior to March 1, 1980, if such redemption is for the purpose or in antici-

pation of refunding such New Bonds through the use or indirectly, of funds borrowed by the Company at an effective interest cost to the Company (calculated in accordance with acceptable financial practice) of less than 10.052% per annum."

(PX-75, pages 21-22).

Page 22 also sets forth a table showing the general and the special redemption prices for every year from 1976 to 2005.

30. Immediately after the table, the prospectus added that "[c]ash deposited under any provisions of the Mortgage (with certain exceptions) may be applied to the purchase of Bonds of any series".

31. A paragraph in the prospectus entitled "Replacement Fund" provided further information. It stated, on page 22, that "the New Bonds, as such, are not entitled to the benefits of a replacement fund". "However", the next sentence continued, "so long as any bonds issued before July, 1970 are outstanding, there shall be expended the amount required by the maintenance and replacement fund requirement". That paragraph included a concise description of the formula for calculating that requirement. It also stated that any deficiency may be made up with cash and that the cash may be applied to the retirement of bonds. (PX-75, page 22)

32. The prospectus disclosed that all or a portion of the bonds were subject to redemption. It further stated when, at what price, and by what means. It employed the standard and customary language used in utility bond prospectuses to disclose these typical special redemption rights. (Dicke, Tr. 1685; Donovan, Tr. 493; Abbott, Tr. 599)

33. The prospectus did not include a prediction concerning the size of the replacement fund deficiencies, if any, which would occur in future years. This does not constitute a misrepresentation or omission of any material fact. Testimony established that there are a number of variables concerning the financial performance, revenues and depreciable property of FPL, as well as the possibility that the company would change the method of calculating the replacement fund requirement, and therefore it was impossible for FPL to predict over the 30-year life of the bonds whether there would be deficiencies and, if so, what their size would be. (Howard, Tr. 312, 1436, 1443) There is no requirement to disclose something that is impossible to predict. (Donovan, Tr. 497) Such predictions, if included in the prospectus, based upon the information available in March 1975, would have been speculative and could give rise to a potential for misleading future investors.

34. In addition to FPL's plans to amend its mortgage, testimony was adduced that a number of circumstances in March 1975 contributed to the unpredictability of future deficiencies. For example, possible adverse rulings in the pending suits arising out of Attorney General Shevin's opinion concerning the fuel adjustment clause procedures could have significantly affected revenues and, hence, the replacement fund requirement. (Howard, Tr. 1436) Also, at that time some cities were considering purchasing FPL's distribution facilities within their municipal boundaries, while other cities were considering selling their own facilities to FPL. (Howard, Tr. 1438) Either action could have significantly affected the "property" calculation of the replacement fund requirement.

35. The prospectus did not state the amount of the immediate past (1974) replacement fund deficiency. This did not constitute either a misrepresentation or an omission of any material fact (Wilson, Tr. 1500) for disclosure purposes. (Wippern, Tr. 964; Meyers, Tr. 1311) For FPL to have stated the amount of the prior year's deficiency would have given rise to a greater potential for misleading future investors than to have refrained from stating that figure. The prior year's deficiency (which had already been made up by certifying property at the time the bonds were sold; [Williams, Tr. 368]) has no significance of its own to an investor. If it were stated, investors might well tend to view the figure as an indicator of the size of future

deficiencies. Because those deficiencies can vary greatly over the 30 year life of the bonds, it would not be proper disclosure to so suggest by implication that there will be future deficiencies and that they will bear some resemblance to the prior deficiency. (Hudiburg, Tr. 723; Howard, Tr. 1790)

36. Events subsequent to the sale of the 10⅛ bonds have demonstrated the unpredictability of deficiencies and their lack of relationship to prior deficiencies. FPL amended the replacement fund requirement formula in its mortgage, so that it presently has no deficiency. (Hudiburg, Tr. 726) FPL had disclosed plans to do so in the 1975 prospectus, although these plans were shelved later in 1975. Had FPL not amended the mortgage, the deficiency presently would have been between $150 million and $300 million. (Howard, Tr. 1442–43)

37. FPL's decision not to state the amount of prior years' deficiencies were consistent with the standard practice in the utility industry. Utility bond prospectuses, including the Tampa Electric Company prospectuses which plaintiffs' expert helped to draft, do not state the amount of previous years' deficiencies. (Donovan, Tr. 504; Meyer, Tr. 1311; Abbott, Tr. 654) *See, e.g.,* DX–143.

38. The 10⅛ bond prospectus did not contain any misrepresentation to the effect that the limitation on *refunding* at general redemption prices also applied to *redemptions* at special redemption prices. The prospectus cover described the limitation on refunding at general redemption prices, then stated in the next sentence: "Such limitation does not, however, apply to redemptions at a special redemption price for the replacement fund ...". (PX–75, page 1)

*Scienter*

39. The 10⅛ bond prospectus employed standard utility prospectus language to disclose its rights under a typical utility mortgage. (Donovan, Tr. 493; Abbott, Tr. 599; Dicke, Tr. 1675)

40. In January 1975, FPL personnel began drafting a preliminary prospectus for the sale of first mortgage bonds. This process was initiated by "marking up" copies of FPL prospectuses used in the immediate past.

41. In February 1975 FPL filed its preliminary prospectus for the bonds which were to become the 10⅛ bonds.

The *preliminary* prospectus stated on its cover:

"The New Bonds will be redeemable, in whole or in part, on 30 days' notice at the redemption prices set forth herein, provided that prior to March 1, 1980, no redemption may be made at a general redemption price through refunding at an effective interest cost to the Company of less than the effective interest cost of the New Bonds."

(DX–2)

The foregoing language was taken from a prior FPL bond prospectus.

42. The cover language appearing on the *final* prospectus was actually drafted by Morgan Stanley, the leader of the group of underwriters which purchased the bond issue from FPL. (Abbott, Tr. 596; Hudiburg, Tr. 715) It is customary for the lead underwriter to use its own format and language on the cover page. (Howard, Tr. 274; Donovan, Tr. 502) Morgan Stanley is recognized in the financial community as "first rate and unimpeachable, an excellent company". (Donovan, Tr. 498)

43. Morgan Stanley was represented in connection with the 10⅛ bond issue by the law firm of Davis, Polk and Wardwell. (Abbott, Tr. 599–600) It is customary for the utility to select underwriter's counsel from a small group of New York firms acceptable to the Wall Street financial community. The underwriters pay their counsel. (Howard, Tr. 1751–53)

44. Prior to printing the final changes in the prospectus, the underwriter's attorney and one other person showed John Hudiburg (at that time an FPL Executive Vice President) a marked-up prospectus cover page containing language pertaining

to redemptions at the special redemption price, which they wanted to place on the cover. They advised him that they considered it better disclosure and asked if he would approve the language. Mr. Hudiburg's understanding was that they were proposing to take language from inside the prospectus and put it on the cover. He gave his approval. (Hudiburg, Tr. 715–17; 739–45)

45. No one at FPL, during any time in 1974 or 1975, gave any consideration to, or discussed, a redemption of bonds through the replacement fund. (Williams, Tr. 454–55; Hudiburg, Tr. 711, 717, 763–64; McDonald, Tr. 513; Howard, Tr. 171–72; Cook, Tr. 1116)

46. At the time FPL sold the 10⅛ bonds, this Court finds that there is no credible evidence that FPL either planned, anticipated or expected to redeem bonds through the replacement fund; and this Court further finds FPL's intention and expectation were that the bonds would be outstanding for 30 years. It amortized the premium and expenses relating to the sale of the bonds over a 30-year period. (Williams, Tr. 457)

47. At the time it sold the 10⅛ bonds, FPL did not recklessly fail to disclose or take into account factors which would have indicated that a replacement fund redemption was likely. The circumstances and factors existing at that time indicated that such a redemption was very unlikely. FPL's disclosure concerning those matters was adequate and correct at the time it was made.

48. In March of 1975, FPL was faced with a serious potential shortage of future fundable property. At that time, the company was not certain if it could include nuclear power plants as fundable property prior to the time the plants received their operating licenses. (Howard, Tr. 1440) The fundable property question was serious enough that the company was planning steps to increase the supply of fundable property. (Howard, Tr. 1444; PX–75, page 23) If FPL had continued with the construction program anticipated in March of 1975, and had used the replacement fund every year thereafter to redeem bonds, it would have run out of fundable property in approximately 1980. (Howard Testimony, Tr. 1446)

49. Another factor militating against an undisclosed, yet planned, early redemption of the 10⅛ bonds in March of 1975 was the Florida Public Service Commission ("PSC") accounting treatment concerning redemption premium and expenses. (McDonald, Tr. 524; Howard, Tr. 1742–44; Williams, Tr. 383) In 1974, the PSC (over FPL's opposition) had adopted the "alternative method" of accounting for expenses of a redemption. (Williams, Tr. 451) Under that method, the expenses would all be recognized during the year in which the redemption took place. (Williams, Tr. 383) FPL had asked the commission to adopt the "primary method", under which the expenses would be amortized over the remaining life of the bonds being redeemed. (Williams, Tr. 383) FPL's Assistant Treasurer, Howard, had supported the same primary method at his previous utility employer in Nebraska and recommended that FPL do the same in 1974. (Howard, Tr. 1742–43)

50. At the time it sold the 10⅛ bonds, FPL was making an effort to amend its mortgage in such a fashion that the replacement fund requirement would be virtually eliminated. (Howard, Tr. 311–12) The prospectus disclosed FPL's position. (PX–75) In order to amend the mortgage, FPL had to get the approval of banks which had loaned money to the company. FPL postponed its plans to amend the mortgage during the second quarter of 1975 because the banks would not give their consent without an unacceptable increase in interest on the loans. (Howard, Tr. 1440–41)

*January—March 1977 Events*

51. In January, 1977, FPL began testimony in a utility rate case before the Public Service Commission, (hereinafter referred to as "PSC"), with the testimony of its then President, Mr. Marshall McDonald.

He was cross examined by the PSC as to why FPL's debt cost was higher than other Florida utilities. (McDonald, Tr. 566, 569; Howard, Tr. 1813) As a result in part from the PSC questioning, FPL management was looking for ways to reduce capital costs.

52. On February 17, 1977, Joe Howard, Assistant Treasurer of FPL, attended a seminar given by Irving Trust Company. At the seminar, Richard M. Dicke, a partner in the law firm of Simpson Thacher & Bartlett, informed those in attendance, including both institutional buyers and sellers of utility bonds, of the rights of many utilities to put up cash to meet replacement fund requirements and to use that cash to redeem bonds. (Howard, Tr. 1454–60) Dicke also stated that the refunding limitations applicable to utility bonds almost invariably relate to the general redemption prices, but not to the special redemption prices applicable to replacement fund redemptions. (DX–26, page 24)

53. Howard then became the first FPL employee to begin investigating a replacement fund redemption. (Howard, Tr. 325) Upon his return from the seminar, he requested that an FPL financial analyst determine the potential value of such a redemption to FPL.

54. On March 9, 1977 John Hudiburg, then Vice President and Chief Financial Officer of FPL, was testifying at the continued rate case hearings before the PSC. He was asked whether FPL had considered "refinancing" bonds since interest rates had dropped, and whether FPL could file an exhibit showing the cost of "refinancing" and the number of years of call provisions for those bond issues. (Hudiburg, Tr. 756) FPL began to prepare such an exhibit as requested, and found that in order to respond fully to the PSC's request, in light of Mr. Howard's analysis of the replacement fund provisions, that it was necessary not only to reference the refunding restriction on general redemptions, but also to explain the other methods, such as the replacement fund, by which its bonds could be redeemed at special redemption

prices. Footnote C to PX–173 (which was designated in the rate case as "Late-Filed Exhibit 68") contained this information. As a result of Mr. Howard's research, a proposal was made on or about March 14 to the FPL Finance Committee that FPL redeem its 10⅛ bonds through the replacement fund (PX–3).

55. On March 14, the Finance Committee of the FPL Board of Directors resolved to authorize the Company's officers to deposit cash with the trustee to meet the replacement fund requirement, if they believed that was appropriate, but decided against making a firm decision at that time to redeem bonds. The Board wished to keep open its option to redeem and to await the PSC's rate order. (Howard, Tr. 1468) The Officer's Certificate ultimately submitted on March 31, 1977, indicated that FPL had decided to meet the replacement fund deficiency with cash, rather than with property additions. (DX–34)

56. FPL filed Late-Filed Exhibit No. 68 with the PSC, as requested. That exhibit demonstrated the cost of refunding (or "refinancing", in the PSC's language) the 10⅛% and 9.85% FPL bonds on March 1, 1980 (five years after they were sold to the public), but noted in a footnote:

> "Bonds are not redeemable at general redemption prices prior to March 1, 1980, if such redemption is for the purpose of refunding the bonds through the use of less than 10.052% per annum. *The bonds may be called at special redemption prices for the replacement fund ...*". (emphasis supplied)

(DX–28)

When the PSC staff saw this exhibit, they asked to examine someone concerning the footnote. Hudiburg advised that they should examine the FPL Comptroller concerning the note since he was yet to testify. (Hudiburg, Tr. 766–67)

57. Williams was examined on March 23, 1977, about the possibility of redeeming any portion of the two high interest bond issues earlier than 1980 and testified that the replacement fund could be so used and that FPL anticipated putting up about $63

million in cash for the replacement fund but retained the option not to redeem any bonds. (DX–27; Williams, Tr. 407–09) FPL issued a press release on that day, after Williams' testimony, announcing that it anticipated that it would deposit cash with the Trustee. (PX–13) No press release had been issued previously because the company could have changed its decision about depositing cash. The release was issued on March 23 because Williams' testimony disseminated the information to those present at the hearing and thus made full public disclosure appropriate. (Hudiburg, Tr. 778)

58. Williams told the PSC that any consideration given to retirement of debt should include changing the PSC accounting regulations in order to amortize the expenses of such a retirement over a period of years, because to that point, the PSC's required accounting procedure imposed all of the costs of a redemption in one year's time, making it more costly and less beneficial.

59. FPL deposited the cash to meet the deficiency with the trustee on March 31, 1977.

### June 1977 Events

60. In its order dated June 16, 1977, the PSC granted rate relief using the assumptions that half of the 10⅛ bonds would be redeemed through the replacement fund. The effect of this order was to reduce FPL's revenues to reflect the assumption of a lower debt cost which would result from redeeming the bonds. The PSC also changed its accounting rules to permit amortization of the redemption expenses over the remaining 28 years of the term of the bonds. (DX–39; DX–175)

61. In late June 1977, a few days after the PSC rate order, FPL's Board of Directors voted to redeem approximately 50% of the outstanding 10⅛ bonds by using the cash previously deposited with the Trustee. The redemption was made at the applicable special redemption price of $100.65 on September 2, 1977, which was the day after

the semiannual interest payment on the bonds.

62. All of the benefits resulting from the redemption were passed through to the ratepayers as a result of the rate order, whether or not FPL actually later redeemed the bonds. FPL's shareholders did not receive any of the cost savings. (Howard, Tr. 195)

This Court finds that no acts or conduct upon the part of FPL in the February—June, 1977 period was or constituted any course of conduct constituting a violation of Rule 10b–5.

### The Market Was Not Misled Concerning FPL's Right to Redeem

63. The initial buyer of the entire bond issue was a syndicate of underwriters led by Morgan Stanley, which is considered (even by plaintiffs' expert) as "one of the Best". (Donovan, Tr. 498) Morgan Stanley was aware of the risk of redemption through the replacement fund. (Abbott, Tr. 596) Morgan Stanley representatives drafted the prospectus cover (Abbott, Tr. 596–97) and modified the earlier language to highlight the disclosure regarding the special redemption rights. (Hudiburg, Tr. 741)

64. Stock and bond rating companies publish descriptions of bond issuers and the specific bonds they issue. Standard & Poor's Corporation Records for 1976 described FPL's corporate background and all outstanding FPL bond issues through 1975 in less than two pages, and described the 10⅛ issue as:

"REDEEMABLE for Sinking and Improvement Replacement Funds, or by Special Retirement Provision on 30 days' notice at following prices and interest thru the date indicated, prices declining each year after to 100: ... 10⅛s, 2005, thru last day of each Feb.: 1977—101.56 1978—101.65 ...".

(DX–33)

65. Another company that rates FPL published a short description of FPL and the issue (to become the 10⅛ issue) before the bid was awarded and the final prospec-

tus was released, which reported that the bonds were "Nonrefundable at lower interest cost prior to May 1, 1980: *otherwise callable at prices to be supplied by amendment*". *Moody's Bond Survey*, February 24, 1975, at 1588. (Emphasis supplied.) (PX–138)

66. The proposed language for the foregoing publications was not sent to FPL before dissemination and it is not certain that FPL ever received copies of the issues of those publications relating to the 10⅛ bonds.

67. *Moody's Public Utility Manual* was and is published annually and proofs are sent to FPL in advance of publication, as to which FPL makes suggestions. This publication in 1975 included over a five page description of FPL bonds alone. It stated at p. 1655 that the 10⅛ FPL bonds were "callable for replacement fund (which see) ...". *Moody's* then states the special redemption prices for every year from 1976 to 2005. The "(which see)" reference is to a paragraph describing the replacement fund. The description of the replacement fund states the formula for the fund requirement; that FPL will spend that amount annually for maintenance and replacements; that any deficiency may be made up by depositing cash; and that such cash may be applied to the retirement bonds. This publication was issued in September of 1975. (DX–14)

68. Standard & Poor's *Bond Guide* is another shorter tabular booklet which publishes statistics concerning bonds generally, in a more abbreviated format than the *Moody's Public Utility Manual*. The *Bond Guide*, however, stated that the earliest price at which the 10⅛ bonds could be called for "S.F." (sinking fund) purposes was 101.66, and that the earliest refund price was 109.76 in 1980. Proofs of the *Bond Guide* were *not* sent to FPL or reviewed by it.

69. ANLIC was a sophisticated, knowledgeable investor. In April and May of 1976, ANLIC purchased Alabama Power 10½% bonds all at prices above the special redemption price. ANLIC was conscious of the vulnerability of the bonds to a special redemption and, thus, took the risk. (Harbeck, Tr. 1237) ANLIC understood from the language of the prospectus that a special redemption could occur through the maintenance and replacement provision as well as the sinking or improvement fund.

70. Anchor had previously purchased certain Alabama Power Company bonds which were redeemed early through the operation of a sinking or improvement fund requirement of the Alabama Mortgage. ANLIC's bond purchaser, Jay Harbeck, its Senior Vice President, was aware of the early redemption by Alabama Power and had become aware of it when he had worked at Lehman Brothers, prior to going to Anchor and ANLIC. Notwithstanding Harbeck's knowledge of the Alabama Power special redemption, and the other provisions of its mortgage, Anchor continued to recommend purchases of Alabama Power bonds to ANLIC. (DX–98—DX–100)

71. ANLIC's officer Harbeck knew that utilities can redeem through the maintenance and replacement fund, and indeed he asked "it's a feature of the bond, isn't it?", according to his testimony, which was given only by deposition at the trial. (Harbeck, Tr. 1244) ANLIC agreed that the market for utility bonds reflects the risk of special call provisions. ANLIC assumes that if the circumstances are legal and the company has the cash, they will carry out the redemption. (Harbeck, Tr. 1246) Harbeck believed that the financial community was aware prior to March 1977 that bonds are vulnerable to redemption when interest rates fall. (Harbeck, Tr. 1241)

72. Even after FPL had accomplished its redemption of part of the 10⅛ bond issue, ANLIC was still willing to stay invested in FPL bonds. ANLIC Annual Statement, DX–42 at p. 30C.2 As its officer, Harbeck said, "It's a gamble". (Harbeck, Tr. 1243–44)

73. In January 1977, E.F. Hutton published an *Industry Review, Electric Utilities, Weekly Market Data* (January 28, 1977) which was also in the ANLIC files. The publication warned:

"... there is a very real possibility that a bond will be redeemed before maturity as a consequence of interest rates falling below the coupon rate of the bond. The higher a bond's coupon rate, of course, the greater the probability that the bond will be redeemed." (p. 2) (DX–56)

The financial community was aware in 1977 that because of the drop in interest rates high coupon bonds were vulnerable to early redemption and that the higher the coupon that the bond had, the greater the chance of redemption. (Harbeck, Tr. 1241) As of the date of the aforementioned E.F. Hutton publication, the outstanding bonds with the highest coupons were those issued in 1974 and 1975. Thus, E.F. Hutton warned about the probability of redemption of high coupon bonds even though most high coupon utility bonds had "financial no call" protection, that is, they could not be redeemed in anticipation of refunding.

74. The 10⅛ bonds, as well as similar bonds, traded at a price reflecting investors' perception of the risk of redemption. (Meyer, Tr. 1303, 1305) The 10⅛ bonds traded 84 basis points in yield to maturity *above* Moody's Averages for A rated bonds, in early 1977. (Wilson, Tr. 1506–09) They also traded 70 basis points in yield to maturity *above* FPL's 9.85% bonds in early 1977. (Wilson, Tr. 1506–09)

75. Plaintiffs' expert, Ronald Wippern, testified regarding the market behavior of the 10⅛ bonds compared to other bonds which he deemed to be comparable. He detected a change in yield to maturity patterns beginning about May 1977, which he attributed to the introduction of "new information" concerning the 10⅛ bonds. (Wippern, Tr. 908) He concluded that the "new information" was that FPL had the right to call the bonds, not that it was considering exercising that right. (Wippern, Tr. 913) Wippern "tested" this "hypothesis" by comparing the price behavior of the 10⅛ bonds to that of Duke Power Company's 9.5% bonds, which he believed were effectively non-callable. (Wippern, Tr. 920) Because he detected no difference in price behavior between the 10⅛ bonds

and the Duke Power bonds, he concluded that investors perceived the 10⅛ bonds to be non-callable, in the same fashion as the Duke Power bonds. (Wippern, Tr. 922–23)

76. In fact, the Duke Power bonds were freely redeemable at special redemption prices through a "proceeds of released property fund" in the Duke Power mortgage. (Wilson, Tr. 1501–05) In 1976, Duke was attempting to sell a nuclear power plant, a fact which it disclosed in its prospectuses. (Wilson, Tr. 1504) The sale proceeds would have been more than enough to redeem the entire bond issue. (Wilson, Tr. 1505) For this reason, the similarity which Professor Wippern noted between the FPL bonds and the Duke Power bonds tends to disprove his own hypothesis and to support Richard Wilson's opinion that the price of the 10⅛ bonds dropped because FPL announced that it was considering the exercise of a disclosed right. (Wilson, Tr. 1515–16)

*This Was Not a Refunding*

77. The terms "redemption" and "refunding" are not synonymous. A "redemption" is simply a call of bonds. A "refunding" occurs when the issuer sells bonds in order to use the proceeds to redeem an earlier series of bonds. (Gerrish, Tr. 80, 85; Abbott, Tr. 607) The refunding bond issue being sold is closely linked to the one being redeemed by contractual language and proximity in time so that the proceeds will be available to pay for the redemption. Otherwise, the issuer would be taking an inordinate risk that market conditions would change between the redemption of the earlier issue and the sale of the later issue.

78. FPL's 1962 refunding of bonds is an example of a refunding. (Williams, Tr. 461) FPL sold a series of 4½% 30 year first mortgage bonds in order to redeem an earlier series of 5¼% first mortgage bonds. Both the prospectus for the redeeming issue (DX–93), and FPL's application to the PSC's predecessor for authority to sell the redeeming issue and refund the earlier issue, state that the redeeming issue is to be

sold to secure funds which will be used to retire all of the earlier issue. (DX–93, page 2; DX–96, page 6) FPL's Notice of Intent to Redeem stated that it was subject to the trustee's receipt of the redemption monies from the pending financing arrangements and would be of no effect unless those monies were received. (DX–94)

79. The 1977 redemption was not a refunding. Although then Assistant Treasurer Joe Howard had recommended that bonds be sold to redeem the 10⅛ bonds, the company's Finance Committee rejected that recommendation. FPL did not sell any bonds to redeem the 10⅛ bonds. (Howard, Tr. 1474)

80. FPL keeps a minimum amount of cash in the bank. To meet its day-to-day cash needs, the company buys and sells short term commercial paper. (Howard, Tr. 1472–73) At a given time, if the amount of commercial paper in which the company has invested exceeds the amount which it has sold, the company is in a "net invested" position. If sales of short term paper exceed investments, the company is in a "net borrowed" position. (Howard, Tr. 217–18) On March 31, 1977, when the company actually deposited approximately $67 million with the trustee, it sold approximately $37.5 million in commercial paper to generate cash. (PX–38; Howard, Tr. 217) By May of 1977 (more than a month before the decision to redeem bonds), FPL had generated sufficient money through internal sources to have paid off the commercial paper and was in a net invested position. (Howard, Tr. 1473)

81. At the time FPL made the decision to redeem bonds, it had no plans to sell any first mortgage bonds, preferred stock or common stock during 1977. (Howard, Tr. 1475–76; PX–21) FPL's financing plan for that year included only a pollution control bond financing. Pollution control bonds are actually sold by a municipality or county authority on FPL's behalf. The funds must be used for the sole purpose of paying for specific pollution control projects. The bonds must be sold not later than one year after the project goes into service. (Howard, Tr. 1476–77)

### There Is No Evidence That Absent Fraud The Bonds Could Not Have Been Issued At All

82. In the absence of proof of reliance, plaintiffs assert that the 10⅛ bonds could not have been brought to market at all but for fraudulent disclosure by FPL. Plaintiffs' hypothetical questions to defendant's expert witness, Kenneth Meyers, reflect plaintiffs' position as to what disclosure should have been included. (Meyers, Tr. 1365, 1367 & 1369) In each instance, Meyers was asked to assume that the prospectus contained a given statement, then asked to give an opinion as to the marketability of the bonds if that statement had actually been included. In each instance, Meyers' expert opinion was that inclusion of the statement would not have affected the marketability of the bonds.

83. FPL's other expert witness was Richard Wilson, a Vice President, Senior Fixed Income Specialist and Manager of the Corporate Bond Research Unit, Fixed Income Research Department, Merrill Lynch Pearce Fenner & Smith. Mr. Wilson testified that utility bonds were marketable in March 1975 without absolute redemption protection. His testimony was based upon the fact that most long-term electric utility bonds which came out at that time did not have absolute call protection. Usually, they were currently callable but had five years of protection against refunding at general redemption prices. (Wilson, Tr. 1489–90)

84. Plaintiffs' expert witness, James Donovan, testified that if FPL had disclosed that the replacement fund probably will have an annual deficiency in excess of $50 million for at least five years, and FPL reserves the right to redeem at special redemption prices, he didn't think that the bonds would have reached the market because of their pricing. The basis for his opinion was that he "doubted" that the PSC would allow FPL to sell the bonds because the price would be too low, which

was based upon the unsupported assumption that PSC approval is required to sell bonds at a given price. (Donovan, Tr. 490) Another basis for his opinion was his belief that FPL probably wouldn't have accepted the underwriters' bid because it would be too low. (Donovan, Tr. 491) There was no testimony to establish how low such a bid would be, or that FPL would not accept such a bid. The testimony sought to be elicited from this witness is highly speculative.

85. Plaintiffs' expert Ronald Wippern did not testify that the FPL bonds would have been unmarketable. He stated that investors paid more for the bonds than they would have, based upon the additional information which he testified they should have been given. He also stated that it is equally plausible to suppose that investors might not have purchased the bonds at all. (Wippern, Tr. 988-90)

86. In fact, many bonds were sold in 1975 without call protection. (Wilson, Tr. 1489; Meyer, Tr. 1302) Defendant's expert, Wilson, gave five examples of other utility bonds issued in 1975 with refunding protection applicable to general redemption prices only. (Wilson, Tr. 1490)

87. Considering the totality of the evidence, this Court finds that there has not been a showing by credible evidence that absent the additional disclosure suggested by plaintiffs, the bond issue could not have been marketed.

### Additional General Findings

88. This Court finds that FPL Company adequately disclosed on the cover of the Final Prospectus and within same that it reserved the right to utilize the replacement fund by depositing cash in lieu of property and thereafter redeeming bonds. The Final Prospectus in 1974-1975 had to be distributed to purchasers who purchased within thirty days after issuance. Thereafter there was no requirement for distribution to purchasers in the "after" market. (Gerrish, Tr. 91-94) Even the preliminary prospectus adequately disclosed the reserved cash option redemption within the provisions of said prospectus. It is inaccurate to say that the disclosures in the four documents described in Paragraph 3 hereof caused a widespread market belief of non-redemption permitted for five years after issuance and this Court finds that the plain language contained in the prospectuses clearly indicated the reserved right to utilize the replacement fund for redemption of bonds as therein provided. The description of the replacement fund was sufficient, adequate and unambiguous in the prospectuses and bidding documents.

None of them worked or caused a fraud on the marketplace by artificially inflating the price of the bonds.

89. The evidence does not sustain a finding that FPL could not have brought these bonds to market at all had it not committed fraud on the market. This Court construes the facts in this case as requiring proof of reliance; nevertheless, the Court alternatively finds that there was no fraud on the market caused by the actions of FPL Company.

90. This Court further finds that the actions of defendant in connection with the redemption in 1977 did not constitute a course of conduct in violation of Rule 10b-5 or Section 10(b); that is, the facts surrounding the decision announcement and subsequent actions relating to the deposit of monies in the Replacement Fund which were subsequently used in that year to redeem bonds, did not constitute a fraudulent course of action.

91. This Court finds that the 1977 redemption was not a "refunding" of the 10⅛ bonds and even if it were so construed, the prospectus was not misleading because it clearly disclosed that the limitation on refunding did not apply to redemptions at a special redemption price for the replacement fund.

### Conclusions of Law

■ 1. A plaintiff whose claim is based upon misrepresentations in securities disclosure documents under Rule 10b-5(b)

**568**

must establish the following elements in addition to his own due diligence:

(1) a misstatement;

(2) of material fact;

(3) made with scienter;

(4) on which the plaintiff reasonably relied; and

(5) which proximately caused his injury.

*See, Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981); *Croy v. Campbell,* 624 F.2d 709, 715 (5th Cir.1980); *Cameron v. Outdoor Resorts of America, Inc.,* 611 F.2d 105 (5th Cir.1980); *Moody v. Bache & Co., Inc.,* 570 F.2d 523, 527 (5th Cir.1978).

2. A plaintiff whose claim is based upon omissions in securities disclosure documents under Rule 10b–5(b) has the same burden of proof, except that he is entitled to a rebuttable presumption of reliance. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

▮▮▮ 3. A plaintiff who did not rely on misrepresentations or omissions in securities disclosure documents may recover on a broader theory of fraud under Rule 10b–5(a) or (c) only if he proves that, absent the defendant's fraud, the securities would never have been issued or marketed at all, rather than merely that they would have been offered at a lower price or a higher rate of interest. *Shores v. Sklar,* 647 F.2d 462, 470 (5th Cir.1981) *(en banc ), cert. denied,* —— U.S. ——, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). This Court has already made a Finding of Fact that the additional disclosure suggested by plaintiffs would not have made the bond issue unmarketable. Accordingly, as a Conclusion of Law, this Court finds that under *Shores v. Sklar, supra,* plaintiffs have failed to prove that the bonds were marketed pursuant to a scheme which was intended to and did bring the bonds onto the market fraudulently under conditions in which plaintiffs relied upon or were entitled to rely upon the integrity of the offerings of the securities market.

▮▮ 4. The plaintiffs in this case have asserted a violation of Rule 10b–5(b). Their allegations must be characterized as claims of misrepresentations or inadequate disclosure in securities disclosure documents, not omissions. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 547–48 (5th Cir.1981), *rev'd* on other grounds, —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Because none of the plaintiffs read the documents which are the subject of their claim, they cannot establish reliance and may not recover upon that basis. *Shores v. Sklar,* at 468.

5. Even if the plaintiffs had established a broader theory of fraud under Rule 10b–5(a) or (c), their recovery would be precluded by their failure to establish that, absent fraud by FPL, the bonds would never have been issued or marketed at all. *Shores v. Sklar,* at 470.

▮▮ 6. The securities disclosure documents about which plaintiffs complain, when read as a whole in light of the circumstances in which they were made, do not contain misrepresentations or omissions. *See, Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97 (5th Cir. 1974). They fully disclose FPL's ability, at any time, to redeem some or all of the bonds at disclosed special redemption prices. *Alabama Power* involved a class action alleging purchase of bonds on reliance upon a prospectus which allegedly misrepresented redemption provisions of the bonds, specifically, by operation of the sinking fund. The Fifth Circuit found that the prospectus, taken as a whole, was not misleading, holding:

"In light of the disclosures made in the description of the redemption provisions on page 27 of the prospectus, purchasers of the bonds cannot make a good faith argument that the prospectus omits the material facts pertaining to those provisions. The complaint should not be read as alleging total non-disclosure; it alleges only inadequate disclosure—disclosure of material facts in such a way as to render the prospectus as a whole misleading.

We conclude, to the contrary, that the prospectus adequately disclosed the redemption provisions of the bonds. The statement on the cover pages must be read in context, 'in light of the circumstances in which it was made'. It was intended to be, and should have been read in connection with the description at page 27. So read, it was not misleading, nor was the prospectus as a whole."

At p. 101

.    .    .    .    .

"The appellant argues that the prospectus failed to caution investors about foreseeable increases in the sinking fund requirement. The prospectus, however, made no implied representation that requirements of the sinking fund would not increase. The prospectus stated that the mortgage required annual payments into the sinking fund equal to one percent of the bonds outstanding under the mortgage. Thus it was clear that each new issue of first mortgage bonds would increase the sinking fund requirement."

At p. 101–02

Although *Alabama Power* involved the use of the sinking fund for bond redemptions purposes, nevertheless, the mortgage and the prospectus specifically also referred to maintenance and replacement provisions as constituting redemption provisions, and except for the fact that *Alabama Power* related to the use of the sinking fund and the instant case relates to the use of the maintenance and replacement fund, the two cases are remarkably similar. The Court held that even though the cover of the prospectus did omit information regarding call protection for sinking fund redemption, nevertheless, the prospectus itself, when considered in its totality, made adequate disclosure of the redemption provisions.

As the Fifth Circuit also pointed out in *Alabama Power:*

"[A]s Chief Judge Lumbard has pointed out, it is 'reasonable [for the issuer] to assume that investors who [purchase] their bonds would familiarize themselves with the conditions under which they were issued, and particularly the terms of redemption, by reading the few short paragraphs on the face of the bonds.' *Abramson v. Burroughs Corp.*, S.D.N.Y.1972, CCH Fed.Sec.L.Rep. ¶ 93,456 at 92,254."

*Associated Builders, Inc. v. Alabama Power Co., supra,* at p. 101

■ 7. Plaintiffs cannot prove a misrepresentation or omission by asserting failure to disclose a nonexistent intent or to describe remote future contingencies under provisions of FPL's mortgage. *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.1981) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). FPL did not intend, at the time the bonds were issued, to redeem the bonds at special redemption prices within five years, nor did it intend to refund the bonds. The likelihood at the time of issue that unpredictable circumstances would later lead FPL to decide to redeem some or all of the bonds at a special redemption price was remote. The redemption which took place was not a refunding. *See, Franklin Life Ins. Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602, 614–15 (S.D.Ill.1978), *affirmed,* 598 F.2d 1109 (7th Cir.1979).

■ 8. A misrepresented or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to buy the bonds. *See, TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Huddleston v. Herman & MacLean, supra,* at 543. The likelihood at the time of issue that FPL would later redeem some or all of the bonds at a special redemption price was unknown and unknowable and, therefore, not a material fact.

■ 9. Predictions are not material unless they can be calculated with substantial certainty. *James v. Gerber Products, Co.,* 587 F.2d 324 (6th Cir.1978). In 1975, FPL could not calculate with any certainty the likelihood of redemption for the replacement fund during the 30 year "lifetime" of

the bonds, nor the size of any such redemption.

10.   In March 1975, the probability of FPL doing a maintenance and replacement fund redemption was remote, the anticipated magnitude of any such redemption was speculative and FPL had no plans to do such a redemption.   Under those circumstances, further information regarding the possibility of such redemption was not material and, therefore, disclosure was not required.  *See, Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737 (2d Cir.1978); *Staffin v. Greenberg*, 509 F.Supp. 825 (E.D.Pa. 1981) *aff'd*, 672 F.2d 1196 (3rd Cir.1982).

■   11.   FPL did not sell the bonds with "a mental state embracing intent to deceive, manipulate or defraud", and did not act with "severe recklessness".

■   12.   The use of standard or typical language in the disclosure documents negates the allegation of scienter or severe recklessness required for liability.  *See, e.g., Broad v. Rockwell International Corp.*, 642 F.2d 929, 962 (5th Cir.1981) (*en banc*), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).   In *Broad*, the Court found that the drafting of the indenture provisions in question was absolutely typical of industry practice to use "boilerplate" language which was used and re-used verbatim, without discussion at the time of each new issue's offering.   The use and re-use of standard and customary language, as opposed to "aberrational" language, is entitled to some weight against the accusation that it was wilfully designed to mislead or recklessly allowed to disguise.  *Franklin Life Ins. Co. v. Commonwealth Edison Co.*, 451 F.Supp. 602, 609 (S.D.Ill.1978), *aff'd.*, 598 F.2d 1109 (7th Cir.1979).

■   13.   Establishing due diligence on their own part is the plaintiffs' burden.   *White v. Sanders*, 689 F.2d 1366, 1369 (11th Cir.1982); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 953 (5th Cir.1981).   The plaintiffs offered little, if any, evidence of their own due diligence in making their investment decisions, which respectively involved a reckless disregard for, or deliberate inattention to, the contents of the FPL prospectus, which none of them read or consulted, as well as an apparent and knowledgeable willingness to "gamble" on the part of the more sophisticated investor, ANLIC.

■   14.   This Court concludes as a matter of law that the documents issued by FPL Company in connection with the subject bond offering and, specifically the Final Prospectus, did not violate the Securities Act of 1934, Section 10(b) and Rule 10b–5, in that FPL did not fraudulently misrepresent its right to redeem the bonds at special redemption prices through the replacement fund provision of the mortgage;  nor did FPL engage in a course of conduct at or about the time of redemption which constituted fraud on the market and, specifically, not fraud within the context of Section 10(b) and Rule 10b–5.

15.   There is no causal connection between the misrepresentations or omissions plaintiffs assert and any compensable loss.

16.   The Court has jurisdiction of this cause, and of the parties, pursuant to the provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

17.   This Court simultaneously herewith will enter its Final Judgment under which plaintiffs shall take nothing and defendant shall go hence without pay and defendant shall recover its cost of this action from plaintiffs.