765 F.2d 1039
 Fed. Sec. L. Rep. P 92,235
Samuel W. LUCAS and Belle Lucas, his wife, and Florence
Anthone, in their own names and on Behalf of all
other persons similarly situated,
Plaintiffs-Appellants,
v.
FLORIDA POWER & LIGHT COMPANY, a Florida corporation,
Defendant-Appellee.
 No. 83-5797.
 United States Court of Appeals,
Eleventh Circuit.
 July 16, 1985.
 
 Sidney M. Pertnov, Jay Solowsky, Miami, Fla., for plaintiffs-appellants.
 Richard C. Smith, Steel Hector & Davis, Miami, Fla., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HILL, KRAVITCH and SMITH*, Circuit Judges.
 EDWARD S. SMITH, Circuit Judge:
 
 
 1
 In this class action securities disclosure case, plaintiffs-appellants (the class), beneficial owners of first mortgage bonds issued by defendant-appellee, Florida Power & Light Company (FPL), appeal from a judgment of the United States District Court for the Southern District of Florida, holding against the class on its securities disclosure claim[1] resulting from redemption of allegedly nonredeemable bonds. We affirm.
 
 Issues
 
 2
 The class brought this action under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5[2] of the Securities and Exchange Commission (SEC). The elements of such an action, and hence the issues of this case, are well settled as requiring the class to establish, on the part of FPL: (1) a misstatement or an omission; (2) of material fact; (3) made with scienter; (4) on which the class reasonably relied; (5) which proximately caused the class' injury.[3] Since the class must prove each and every one of these elements to prevail, and since the district court found it proved none, if we affirm the lower court on only one of the above issues, the class will not prevail on appeal. Or, put another way, we must reverse the lower court on each and every issue for the class to prevail on appeal.
 
 Standard of Review
 
 3
 This court reviews the trial court's findings of fact under the clearly erroneous rule[4] and reviews issues of law independently. Mixed questions of law and fact, such as questions of materiality, scienter, and reliance, involve assessments peculiarly within the province of the trier of fact and hence are reviewable under the clearly erroneous rule.[5]
 
 Background
 
 4
 On March 13, 1975, FPL sold $125 million (principal amount) of first mortgage bonds to a group of underwriters, led by Morgan Stanley & Co., for distribution to the public. The interest rate on these bonds was the highest ever paid by FPL, 10 1/8 percent. They were to be offered for sale to the public at a price of 101.633 percent of par value and accrued interest. Various documents accompanied the bonds during the bidding process, the most important of which was the final prospectus, dated March 13, 1975.[6] On page 1 of this prospectus, below the heading, the first paragraph stated:
 
 
 5
 The New Bonds will be redeemable, in whole or in part, upon not less than 30 days' notice at the general redemption prices and, under certain circumstances, at the special redemption prices as described herein, provided that, prior to March 1, 1980, no redemption may be made at a general redemption price through refunding at an effective interest cost to the Company of less than 10.052% per annum. Such limitation does not, however, apply to redemptions at a special redemption price for the replacement fund or with certain deposited cash or proceeds of released property. The special redemption prices for the New Bonds are 101.67% of the principal amount through February 29, 1976 and decrease thereafter to 100% for the twelve months ending February 28, 2005. See "New Bonds--Redemption and Purchase of Bonds" herein. [Emphasis supplied.]
 
 
 6
 Further discussion in the prospectus about the possibility of special redemption will be analyzed in the opinion below. The above-quoted paragraph is clear that prior to March 1, 1980, the bonds were, simply stated, nonrefundable[7] for 5 years after issuance--an attractive feature for bonds issued at an historically high interest rate, assuming the investor believed interest rates had peaked and would be declining during the ensuing 5-year period. Purchasers and class representatives Samuel and Belle Lucas, Florence Anthone, and Anchor National Life Insurance Company (Anchor), obviously so believed, for they bought the bonds in the following amounts: 10 each for the Lucases and Anthone, on February 14, 1977, and March 14, 1975, respectively, and over $6 million worth for Anchor between May 1976 and January 1977. The trial court found and the class conceded that none of these purchasers read the prospectus. Instead, they relied on their stockbrokers and/or various other sources of information. Lucas, in particular, specified to his broker that he wanted noncallable bonds.
 
 
 7
 In late June 1977, FPL's Board of Directors voted to redeem approximately half of the outstanding 10 1/8 bonds at the special redemption price of $100.65 on September 2, 1977. This action and its execution culminated a series of events which we will try fairly to summarize.[8] On June 16, 1977, the Florida Public Service Commission (PSC) granted FPL customers utility rate relief on the assumption that FPL would redeem half the 10 1/8 bonds. This rate reduction resulted from hearings before the PSC dating from January 1977, at which FPL officers testified. The PSC questioned FPL why its debt cost was higher than other Florida utilities. In part because of this questioning, FPL began looking for ways to reduce capital costs. In early March 1977 the PSC asked FPL to file an exhibit showing the cost of "refinancing." FPL did so, explaining not only the 5-year refunding restriction on general redemptions, cited on page 1 of the prospectus quoted above, but explaining in a footnote the possibility of a special redemption, using the replacement fund. The PSC further examined FPL about the footnote.
 
 
 8
 The replacement fund constitutes a covenant in FPL's original 1944, SEC-approved mortgage, whereby FPL promises annually to spend a certain sum "for maintenance and replacement of the mortgaged property, for the construction of [certain] property * * * or for the redemption or purchase and cancellation of bonds (but not including bonds retired pursuant to the sinking fund provisions)."[9] (Emphasis in original.) Any deficiency in the required annual expenditures is "to be made up by the deposit of cash with the Corporate Trustee as a maintenance and replacement fund."[10] (Emphasis in original.) FPL must annually file an Officer's Certificate of Replacements with the corporate trustee of the mortgage, setting forth, among other things, the manner in which FPL complied with the replacement fund requirement for the preceding year. If there is a deficiency--i.e., actual maintenance expenditures are less than the required amount--FPL must make up the difference. This may be done by "certifying" property to, or by depositing cash with, the trustee, which cash may then be used to redeem bonds of any series.[11]
 
 The trial court found that:[12]
 
 9
 Prior to the redemption herein, FPL has never redeemed any substantial amount of bonds issued under the mortgage by the use of cash deposited in the replacement fund by reason of a decision not to take credit for available property additions. Historically, it was the custom and usage among electric utilities that contributions to the maintenance and replacement funds be made in the form of improvements or additions to property and not by cash.
 
 
 10
 Since redemption of bonds using cash deposited with the replacement fund had, for all practical purposes, never been done before, when FPL announced in a press release on March 23, 1977, that it might do so, the investment community reacted strongly. This was evidenced by numerous phone calls to FPL and newspaper articles at this time and following the final redemption decision. For example, the record includes a June 28, 1977, Miami Herald finance article headlined, "FPL to Redeem Bonds, Buyers Are Outraged." A more subdued article in Financial World, subheaded "Read the fine print," began:
 
 
 11
 On March 23, 1977, Florida Power & Light stunned the corporate bond market by announcing it was considering refinancing $63.7 million of 10 1/8% bonds due 3/1/05 at a special redemption price of 101.65. Previously the holders of the $125 million issue believed the issue could not be refunded at an effective interest cost lower that [sic ] 10.052% prior to 3/1/80, five years after it was issued, and only then at a call price of 109.76--relatively standard call features for a long-term utility offering. [Emphasis in original.]
 
 
 12
 This class action was instituted in September 1977 and represents a class in excess of 3,600. In November 1982 the district court bifurcated the damage issues from liability and in 1983, after almost 6 years of discovery, a nonjury trial extending over 8 days was held. We review here the resulting judgment from the district court.
 
 Opinion
 1-2. Material Misstatements or Omissions
 The district court found:[13]
 
 13
 This Court finds that FPL Company adequately disclosed on the cover of the Final Prospectus and within same that it reserved the right to utilize the replacement fund by depositing cash in lieu of property and thereafter redeeming bonds. The Final Prospectus in 1974-1975 had to be distributed to purchasers who purchased within thirty days after issuance. Thereafter there was no requirement for distribution to purchasers in the "after" market. (Gerrish, TR. 91-94) Even the preliminary prospectus adequately disclosed the reserved cash option redemption within the provisions of said prospectus. It is inaccurate to say that the disclosures in the four documents described in Paragraph 3 [preliminary, bidding, and final prospectuses; bidding documents] hereof caused a widespread market belief of nonredemption permitted for five years after issuance and this Court finds that the plain language contained in the prospectuses clearly indicated the reserved right to utilize the replacement fund for redemption of bonds as therein provided. The description of the replacement fund was sufficient, adequate and unambiguous in the prospectuses and bidding documents. [Emphasis supplied.]
 
 
 14
 The class contends that this finding is erroneous[14] for a number of reasons, chief among them being failure to disclose the size of the 1974 replacement fund deficiency ($54 million) and being vague, omissive, and obscure regarding the susceptibility of the bonds to a replacement fund redemption. In sum, the class contends that omissions and misstatements in the prospectus did not allow an investor to evaluate his vulnerability to a redemption through the replacement fund, particularly during the initial 5-year period of refunding protection. We review these various points, beginning with further analysis of the final prospectus itself.
 
 
 15
 a. The Prospectus and the Replacement Fund
 
 
 16
 We have quoted above the paragraph on the front page of the final prospectus, stating in black-and-white that the 5-year refunding protection does not apply to redemptions at a special redemption price for the replacement fund and referring the reader to "New Bonds--Redemption and Purchase of Bonds." That section, beginning at page 21 of the prospectus, states: "The New Bonds will be redeemable, in whole or in part, on at least 30 days' notice (a) at the special redemption prices set forth below for the replacement fund or with certain deposited cash and proceeds of released property."[15] On page 22 is a table listing the general and special redemption prices for every year from 1976 to 2005. For the critical 5-year period during which the class believed or assumed the bonds were nonredeemable at less than the high interest rate, the table shows:
 
 
 17
 On page 22 a paragraph entitled "Replacement Fund" states: "The New Bonds, as such, are not entitled to the benefits of a replacement fund. However, so long as any series of Bonds created prior to July 1, 1970, is outstanding, there shall be expended for each year * * *." The paragraph goes on to state the formula, pursuant to the 1944 FPL mortgage, upon which is based the calculations for the replacement fund requirement.
 
 
 18
 Based on the face of the final prospectus[16] itself, the trial court found that the prospectus "disclosed that all or a portion of the bonds were subject to redemption. It further stated when, at what price, and by what means."[17] It employed customary "boilerplate" utility bond prospectus language for disclosing these special redemption rights. Our review of the prospectus reveals no clear error in this finding.
 
 
 19
 b. Omission of the Current and Estimated Future Size of Deficiency Fund
 
 
 20
 The class strongly contends that the trial court clearly erred in finding that:[18]
 
 
 21
 The prospectus did not state the amount of the immediate past (1974) replacement fund deficiency. This did not constitute either a misrepresentation or an omission of any material fact * * * for disclosure purposes. [Emphasis supplied.]
 
 
 22
 The class emphasizes that all parties acknowledge that FPL knew of the size of the 1974 replacement fund deficiency when it drafted the prospectus, since the 1974 Officer's Certificate of Replacement was at that time being prepared. The mortgage formula which FPL did include in the prospectus for calculating the deficiency was impossibly vague and omissive, according to the class, leaving the investor no meaningful way to assess the risk of redemption through the replacement fund.
 
 
 23
 The trial court considered extensive testimony on this point. FPL admits that the formula was not "precise to the dollar," but its witnesses contended it was sufficient to show a ballpark $50 million deficiency. The district court noted that utility bond prospectuses, including one which plaintiffs' expert helped to draft, do not state the amount of previous years' deficiencies. Such deficiencies are extremely difficult to predict, being tied to future revenues and property values, among other things.[19] Subsequent to the sale of the bonds at issue, FPL amended its replacement fund requirement formula in the mortgage (as it disclosed it might do in the 1975 prospectus), so that by 1983 it had no deficiency.[20]
 
 
 24
 Considering all the above and having reviewed the record, we find no clear error in the lower court's finding that omission of the 1974 deficiency or future estimates thereof did not constitute a misstatement or omission of a material fact.
 
 
 25
 c. Changes in Historical Patterns
 
 
 26
 The class contends that the changed circumstances of this time--especially rising interest rates and rising fuel costs--dictate changed disclosure, especially since FPL was the electric utility first to redeem a large number of bonds using the replacement fund deficiency. While the point is well taken in relation to today's relatively more stable economic environment, the record shows that FPL did employ "changed disclosure" by highlighting, for the first time, the special redemption possibility on page 1 of the prospectus. The class repeatedly points to the decision to highlight, made at the last minute by suggestion of the counsel to FPL's chief underwriter, Morgan Stanley, as evidence of FPL's scienter not to tell the full story about the deficiency. The fact points the opposite direction in our view, as evidence of more conscientious disclosure in an uncertain environment.
 
 
 27
 d. Application of the Law
 
 
 28
 On the issue of misstatements or omissions, the district court, in its "Conclusions of Law," applied the law as follows:[21]
 
 
 29
 The securities disclosure documents about which plaintiffs complain, when read as a whole in light of the circumstances in which they were made, do not contain misrepresentations or omissions. See, Associated Builders, Inc. v. Alabama Power Co., 505 F.2d 97 (5th Cir.1974). They fully disclose FPL's ability, at any time, to redeem some or all of the bonds at disclosed special redemption prices. * * *
 
 
 30
 We affirm that the lower court properly applied the Alabama Power case to these facts. Alabama Power is highly similar to this case, except that it concerned a redemption by means of the sinking fund instead of the replacement fund. Moreover, the FPL case is stronger than Alabama Power in that (1) the class had the benefit of a full trial, whereas Alabama Power involved dismissal for failure to state a claim, and (2) in Alabama Power the utility did not add the "highlighted" information about possible special redemption to the front page of a similar "boilerplate" prospectus, whereas FPL made this additional disclosure.
 
 
 31
 Regarding the materiality of the misrepresentations or omissions, the district court held and found:[22]
 
 
 32
 A misrepresented or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to buy the bonds. See, TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); Huddleston v. Herman & MacLean, supra [640 F.2d 534 (5th Cir.1981) ], at 543. The likelihood at the time of issue that FPL would later redeem some or all of the bonds at a special redemption price was unknown and unknowable and, therefore, not a material fact.
 
 
 33
 The class' contention on materiality focuses on FPL's omission of the size of the replacement fund deficiency, in view of the importance of the 5-year nonrefunding protection to investors. We have discussed this above and affirmed the trial court's finding that the omission was not of a material fact. The possibility of a special redemption was clear on the face of the prospectus; the vulnerability or likelihood of such a redemption was a matter of speculation at the time.[23]
 
 
 34
 Accordingly, we affirm the lower court's factual findings and its application of the law on the issues of material misrepresentations or omissions. Having done so, the class' appeal is defeated, since it must obtain reversal of every element of the 10b-5 claim to prevail. However, since this is a major case in this circuit in this area of law, and a case which has benefitted from a full trial and thorough opinion below, we touch upon the remaining issues upon which we make no findings or holdings.
 
 3-5. Scienter, Reliance, Injury
 
 35
 The class contends that the trial court erred in not applying the "fraud on the market" theory as first enunciated by this circuit's predecessor in Shores v. Sklar,[24] and recently further explored, after issuance of the district court's judgment, in Lipton v. Documation, Inc.[25] Under this theory the class' conceded failure to read the FPL prospectus would not necessarily be fatal to the reliance aspect of its 10b-5 claim. As the Lipton court stated:[26]
 
 
 36
 [T]his circuit should recognize the fraud on the market theory when applied to class actions alleging that the defendant's deception inflated stock prices in the open market. We agree with the Ninth Circuit that:
 
 
 37
 causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price--when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.
 
 
 38
 Blackie [v. Barrack ], 524 F.2d [891 (9th Cir.1975) ] at 906 (citations omitted).
 
 
 39
 Were Lipton to apply here, the burden of proof to establish reliance would be shifted because presumed, leaving FPL with the burden to show that the misrepresentations were immaterial or that the class' decision to purchase the bonds would have been unaffected if the true facts were known. FPL contends that, if Lipton were to apply, FPL could meet and in fact has met its burden of proof. The class points to alleged misinformation, disseminated by well-known financial publications and analysts regarding the "noncallability" of the bonds, as evidence that FPL could not meet this burden. The trial court found that a close analysis of those publications showed that the market was not misled concerning FPL's right to redeem.[27]
 
 
 40
 We need discuss no further the fraud on the market theory, however, since we have affirmed the district court's judgment on the basis of the face of the prospectus itself and that court's finding that no material misrepresentations or omissions are contained therein. At this juncture--some 8 years after FPL's redemption of the 10 1/8 bonds caused such an uproar, as we have noted by citing above various press reports, and at least 2 years after completion of a full trial--the class' fundamental complaint appears the normal human outrage at occurrence of an event widely believed unlikely to occur. Class representative Anchor continued to hold its FPL 10 1/8 bonds not redeemed, testifying "[i]t's a gamble."[28] One of FPL's expert witnesses testified that "we [bond advisors] got zapped through provisions we knew little about." Outrage and risk-taking, however, do not add up to the elements which must be shown to establish a 10b-5 case.
 
 
 41
 AFFIRMED.
 
 
 
 *
 Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Lucas v. Florida Power & Light Co., 575 F.Supp. 552 (S.D.Fla.1983)
 
 
 [2]
 15 U.S.C. Sec. 78j(b) (1982); 17 C.F.R. Sec. 240.10b-5 (1982)
 
 
 [3]
 See Lucas, 575 F.Supp. at 568; Huddleston v. Herman & MacLean, 640 F.2d 534, 543 (5th Cir.1981)
 
 
 [4]
 FED.R.CIV.P. 52(a)
 
 
 [5]
 See, e.g., Arrington v. Merrill Lynch, Pierce, Fenner & Smith, 651 F.2d 615, 619 (9th Cir.1981); SEC v. Mize, 615 F.2d 1046, 1053 (5th Cir.), cert. denied, 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980)--both citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976)
 
 
 [6]
 Plaintiffs' exhibit 75. This critical document was not designated part of the 14 volumes of record on appeal. It has taken the special efforts of three courts and counsel to obtain it
 
 
 [7]
 The terms "nonrefundable," "nonredeemable," and "noncallable" are often used loosely in this case and may have contributed to investor misunderstanding. Careful reading of the first paragraph of the prospectus shows the 5-year protection to extend to general redemption "through refunding." A refunding--a sale of bonds to redeem an earlier series of bonds--did not occur here. A redemption is simply a call of bonds, as occurred here. Lucas, 575 F.Supp. at 565. The class contests the lower court's finding to this effect, on the theory that a refunding is a retirement of debt to reduce interest costs. We find no clear error in the trial court's finding. The term "noncallable" is used generally, we assume, for bonds neither refundable nor redeemable
 
 
 [8]
 See Lucas, 575 F.Supp. at 561-63. We have also studied carefully the parties' briefs and the record in this regard, since we must ultimately review these facts for clear error
 
 
 [9]
 See Lucas, 575 F.Supp. at 556
 
 
 [10]
 Id
 
 
 [11]
 The trial court ruled as a matter of law that under the mortgage FPL could either certify property or deposit cash to make up the deficiency and this ruling has not been appealed. Hence we stress that we are dealing here not with FPL's legal right to redeem these bonds, but with the adequacy of its disclosure of that right and possibility
 
 
 [12]
 Lucas, 575 F.Supp. at 557
 
 
 [13]
 Id. at 567
 
 
 [14]
 The class believes that this is an "ultimate fact determination" which we may review independently. FED.R.CIV.P. 52(a) contains no language setting apart any such thing as an "ultimate" fact; we review the finding under the clearly erroneous standard. Pullman-Standard v. Swint, 456 U.S. 273, 286 n. 16, 287, 102 S.Ct. 1781, 1789 n. 16, 72 L.Ed.2d 66 (1982). See also Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)
 
 
 [15]
 See Lucas, 575 F.Supp. at 558-59 for further detail
 General Special
 Redemption Redemption
Year Price (%) Price (%)
----------------- ----------------- -----------------
If redeemed during the twelve month period
ending the last day of February,
1976 111.79 101.67
1977 111.39 101.66
1978 110.98 101.65
1979 110.57 101.64
1980 110.17 101.62
 * * * * *
 in each case, together with accrued interest to the
 date fixed for redemption.
 
 
 [16]
 The preliminary prospectus differed chiefly in not highlighting the special redemption possibility on page 1. See Lucas, 575 F.Supp. at 560, 567
 
 
 [17]
 Id. at 559
 
 
 [18]
 Id. The trial court found the same regarding predictions of future replacement fund deficiencies. Id
 
 
 [19]
 Id
 
 
 [20]
 Id. at 560
 
 
 [21]
 Id. at 568
 
 
 [22]
 Id. at 569
 
 
 [23]
 Id. at 569-70
 
 
 [24]
 Shores v. Sklar, 647 F.2d 462 (5th Cir.1981) (en banc), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983)
 
 
 [25]
 Lipton v. Documation, Inc., 734 F.2d 740 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985)
 
 
 [26]
 Id. at 747. Lipton affirmed the trial court's denial of the defendant's motion to dismiss
 
 
 [27]
 Lucas, 575 F.Supp. at 563-65. The district court, applying the then-current Shores, found that the additional disclosure urged by the class would not have made the bond issue unmarketable. Lucas, 575 F.Supp. at 568. Under Lipton the question now would be, in a developed market, whether the additional disclosure would have deflated the price-- i.e., affected the buyers' decisions to purchase
 
 
 [28]
 See Lucas, 575 F.Supp. at 564. Anchor also held Alabama Power bonds redeemed through the sinking fund and litigated in Alabama Power