David A. LIPTON and Sylvia S. Lipton,
Plaintiffs-Appellees,

v.

DOCUMATION, INC., et al.,
Defendants-Appellants.

No. 83–3126.

United States Court of Appeals,
Eleventh Circuit.

June 18, 1984.

Rehearing and Rehearing En Banc
Denied July 23, 1984.

Charles P. Pillans, Peter D. Webster, Jacksonville, Fla., Anthony J. Costanina, Asst. Gen. Counsel, New York City, for Peat Marwick Mitchell & Co.

Jeffrey B. Rudman, Boston, Mass., Edward M. Waller, Jr., Diana L. Fuller, Tampa, Fla., for Documation, Inc.

R. Lee Bennett, Orlando, Fla., for S. Ray Halbert.

Bernard Bonn, III, Boston, Mass., and Lawrence G. Mathews, Jr., Orlando, Fla., for Richard J. Testa & John H. Holcomb, Jr.

Kenneth A. Plevan, Herbert F. Kozlov, New York City, Davisson F. Dunlap, Orlando, Fla., for Robert S. Ames, James F. Morgan & Textron, Inc.

Robert M. Kornreich, New York City, Richard H. Critchlow, Miami, Fla., for plaintiffs-appellees.

Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The plaintiffs brought this proposed class action on behalf of themselves and other purchasers of Documation, Inc. securities, alleging violations of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission rule 10b–5.[1] As the basis of their complaint, the plaintiffs rely on what has commonly become known as the "fraud on the market" theory. Specifically, they allege that the defendants disseminated into the marketplace financial reports and statements that falsely claimed that Documation had substantial earnings and revenue, when, in fact, the defendants knew that the company had suffered a significant net loss. The plaintiffs further allege that although they did not rely directly on these misleading documents, the documents caused the mar-

1. The plaintiffs also allege various state law claims which are not at issue on this appeal.

ket price of Documation securities to become artificially inflated and that they detrimentally relied upon the integrity of the market prices in purchasing the securities. The plaintiffs seek recovery for the losses suffered when Documation's true financial situation came to light and the price of the securities declined.

The defendants moved to dismiss the complaint on the ground that it failed to state a claim upon which relief can be granted, because the plaintiffs had failed to allege direct reliance on the purportedly misleading documents. The district court denied the defendants' motion, concluding that the former Fifth Circuit in *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983),[2] had implicitly adopted the fraud on the market theory and, therefore, the plaintiffs did not need to prove actual reliance to recover. In a subsequent order, however, the district court granted the defendants' motion to certify pursuant to 28 U.S.C. § 1292(b) its prior order holding that this circuit recognizes the fraud on the market theory as "involv[ing] a controlling question of law as to which there is substantial ground for difference of opinion ...." In deciding to certify its prior order, the district court adhered to its conclusion that *Shores* implicitly adopted the fraud on the market theory, but recognized that *Shores* could be read as approving only a very narrow version of the theory. This court agreed to hear the appeal.

I.

■ Reliance is one of the essential elements that a plaintiff must prove to recover in a rule 10b–5 action. *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197

(1977). Requiring the plaintiff to show that he reasonably relied on the defendants' misrepresentations is a means of establishing the "causal link between the misrepresentation or omission and the injuries suffered by the private plaintiff," *id.* at 1016, and of ensuring that the federal securities laws do not expose defendants to limitless liability or become transformed into merely private enforcement mechanisms. *Id.; Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981); *List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

■ The courts have recognized, however, that in certain contexts requiring the plaintiff to prove actual reliance would effectively preclude recovery although causation in fact did exist. The Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), thus held that where the plaintiff's claim is primarily one of failure to disclose,

> positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.... This obligation to disclose and this withholding of a material fact established the requisite element of causation in fact.

406 U.S. at 153–54, 92 S.Ct. at 1472 (citations omitted). In nondisclosure cases, therefore, a plaintiff may prove reliance through a rebuttable presumption that he relied on the undisclosed information, subject to the defendant proving that the plaintiff's decision would have been unaffected even if the omitted information had been disclosed. *Rifkin v. Crow*, 574 F.2d 256, 262–63 (5th Cir.1978).[3]

---

**2.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**3.** The Court in *Affiliated Ute* did not expressly state that a "presumption" of reliance was creat-

ed or that it was rebuttable. This circuit, however, as have other courts, has treated the holding of *Affiliated Ute* as creating a rebuttable presumption. *See* Note, *The Reliance Requirement in Private Actions under SEC Rule 10b–5*, 88 Harv.L.Rev. 584 (1975); *Blackie v. Barrack*, 524 F.2d 891, 906 n. 22 (9th Cir.1975).

The Ninth Circuit in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), extended the rationale of *Affiliated Ute* to situations where the plaintiff class alleges that deception resulted in inflated security prices on the open market. Finding that in such a context proof of direct reliance "imposes an unreasonable and irrelevant evidentiary burden," *id.* at 907, the court held that the burden of proof shifts to the defendant to show either that the deception was immaterial, that an insufficient number of traders relied on the misleading information to inflate the price, or that the plaintiff purchased the securities knowing of the misrepresentation or would have still purchased the securities despite the misrepresentation. *Id.* at 906. The court concluded that such a rebuttable presumption would further the goals of the federal securities laws without dispensing with the requirement of causation, because reliance, albeit indirect reliance on the integrity of the market price, would still exist. *Id.* at 906–07.

■ Since *Blackie*, four other circuits have adopted the fraud on the market theory to varying degrees for rule 10b–5 actions. *See T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated as moot sub nom. Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982; *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).[4] No circuit court has expressly rejected the theory, *but see, Vervaecke v. Chiles, Heider & Company, Inc.,* 578 F.2d 713 (8th Cir.1978) (no presumption of reliance where new issues are involved and claims are based on affirmative misrepresentations),

and the Supreme Court has yet to address the issue.

The fraud on the market theory also has received generally favorable treatment from the commentators. *See* Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions,* 62 N.C.L.Rev. 435 (1984); Rapp, *Rule 10b–5 and "Fraud-On-the-Market"—Heavy Seas Meet Tranquil Shores,* 39 Wash. & Lee L.Rev. 861 (1982); Note, *Fraud on the Market: An Emerging Theory of Recovery Under SEC Rule 10b–5,* 50 Geo.W.L.Rev. 627 (1982); Note, *The Fraud-on-the-Market-Theory,* 95 Harv.L.Rev. 1143 (1982). The theory has been viewed as most sound where it is used in the context of class actions to eliminate the necessity of each class member proving subjective reliance and where the securities were traded on a developed and open market, so that market prices reflect available information about the corporation.[5] Black, 62 N.C.L.Rev. at 437–38. The theory, however, has been criticized when courts have applied it to undeveloped markets, *see* Note, 95 Harv.L.Rev. at 1156–58 (criticizing *Shores v. Sklar*), or used the theory to eliminate the reliance requirement entirely rather than to merely create a rebuttable presumption of reliance, *see* Black, 62 N.C. L.Rev. at 438–39; Rapp, 39 Wash. & Lee L.Rev. at 888–93 (criticizing *Panzirer v. Wolf* as using fraud on the market to extend "chain of causation" too far).

## II.

It is against this background of case law and commentary that we approach the former Fifth Circuit's en banc decision in *Shores.* In *Shores,* the plaintiff had bought industrial revenue bonds and alleged under rule 10b–5 that the defendant had fraudulently marketed the bonds by, among other acts, the issuance of a misleading Offering Circular. The plaintiff

---

**4.** The Eleventh Circuit is bound by the holding of *Shore v. Sklar* by virtue of its decision in *Bonner v. Prichard,* 661 F.2d 1206 (11th Cir. 1981); see *supra* note 2.

**5.** The idea that securities traded on a developed market will reflect the available information on the corporation has become known as the "efficient market" thesis. Black, 62 N.C.L.Rev. at 437; *see also* Note, 95 Harv.L.Rev. at 1154–56.

admitted that he had never read the Circular and that he had bought the bonds solely on the basis of his broker's recommendation. The district court had dismissed all of the plaintiff's claims on the ground that the plaintiff could not show reliance.

The en banc court affirmed the dismissal of the plaintiff's "usual 10b–5" claim based on the Offering Circular's alleged misrepresentations and omissions, because the plaintiff had failed to show the essential element of reliance. 647 F.2d at 468. The closely divided court, however, held that the plaintiff had stated a viable claim in alleging a "broader theory [under which] it would have availed him nothing to have read the Offering Circular ... The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place." *Id.* at 470–71.

In so holding, the majority distinguished between claims based on rule 10b–5(2) and those based on rule 10b–5(1) and (3).[6] Reliance was necessary under 10b–5(2) because liability under that section is premised directly upon the allegedly misleading statements or omissions in the documents. With regard to 10b–5(1) and (3), however, the majority found that direct reliance on the misleading documents is not required, because the language of those sections is aimed at broader schemes of securities fraud. Accordingly, in that case, the plaintiff's "lack of reliance on the Offering Circular, only one component of the overall scheme, is not determinative. *Blackie v. Barrack,* ..." *Id.* at 469. Again citing to *Blackie,* the majority concluded that "[m]isrepresentation and omission cases under 10b–5(2) which, as we do, require reliance on the document making the misrepresentation or omitting the mate-

rial fact are inapposite to a case in which the buyer relied on the integrity of the market to furnish securities which were not the product of a fraudulent scheme." *Id.* at 471.

Finally, the majority looked to the purpose of the reliance requirement for 10b–5 actions. Finding that reliance is a means of ensuring that causation exists between the defendant's acts and the plaintiff's harm, it reasoned that what constitutes a prima facie showing of causation varies with the factual context:

> Whenever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The "reliance" that produces causation in the latter type of case cannot come from reading a document. It may arise from the duty to speak as in *Ute,* a scheme to manipulate the market at a time when a merger had forced a sale as in *Schlick* [*v. Penn Dixie Cement Corp.,* 507 F.2d 374 (2nd Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)], a scheme to inflate common stock prices by misleading statements as in *Rifkin,* or a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created as we have here. The most significant common thread in all these precedents is that rule 10b–5 is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents which mislead a securities buyer. The rule is recognized also to provide the basis for a federal cause of action for more elaborate, intentional schemes which deceive or defraud purchasers of securities.

---

**6.** Rule 10b–5 provides in part:
It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, ...
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The holding in *Shores* was thus premised on two primary rationales: the expansive language of rule 10b–5(1) and (3) and the different ways in which causation may be demonstrated depending upon the nature of the alleged fraud.

Despite the apparently broad reach of the *Shores* holding and its reliance on *Blackie*, the defendants contend that the majority adopted only a very narrow version of the fraud on the market theory, limiting its operation to the context where the securities would never have been placed on the market but for the fraud. In support of their position, the defendants note that the court stated at one point that "if [the plaintiff] proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover." *Id.* at 470. In another passage, the majority similarly observed that the plaintiff's "theory is not that he bought inferior bonds, but that the bonds he bought were fraudulently marketed. The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers him for purchase are entitled to be in the market place." *Id.* at 471.

We believe that much of the confusion surrounding the *Shores* opinion [7] is clarified once the unique fact setting of the case is taken into account. Whereas the "classic" fraud on the market case arises out of transactions on an open and developed market, in *Shores* the plaintiff was buying newly issued bonds. The *Shores* court was therefore faced with the difficult task of applying a doctrine developed in one context, the open market, to the not entirely analogous setting of newly issued securities. Indeed, the *Shores* dissent objected to the majority's opinion not because the majority was adopting the fraud on the market theory, but because it saw the opinion as extending the theory in an unprecedented manner. 647 F.2d at 477–79 (Randall, J., dissenting).

The *Shores* holding was thus necessarily confined to the limited setting of newly issued securities traded on an undeveloped market and did not determine whether the fraud on the market theory should apply to the open market context. It is that question which is now before this court.

### III.

Although the *Shores* court did not decide the precise issue before us, we still find that to a large degree the decision dictates that this circuit recognize the fraud on the market theory as a basis for recovery where the defendant's deception inflates open market stock prices. To hold otherwise would result in this circuit adopting the theory in a setting where its applicability has been questioned, and rejecting its use where it best advances the goals of the federal securities laws.

As noted above, the fraud on the market theory finds its greatest justification when applied to class actions alleging fraudulent misrepresentations or omissions that affected security prices on a developed open market. In such a context, it is reasonable to assume that misinformation disseminated into the marketplace will affect the market price. It is also reasonable to

---

7. The district court read *Shores* as adopting an unqualified version of the fraud on the market theory, but recognized that "there is support for [the] position that *Shores* approved only a very narrow version of the 'fraud on the market' theory." The court below is not alone in its uncertainty of how to read *Shores*, as the courts and commentators have also disagreed as to whether *Shores* adopted an expansive approach to the fraud on the market theory or a more restrictive version. *Compare Kennedy v. Nicastro*, 517 F.Supp. 1157 (N.D.Ill.1981) (*Shores* adopted limited version of fraud on the market); Note, 95 Harv.L.Rev. 1143 (1982) *with T.J. Raney & Sons v. Fort Cobb Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330, 1333 (10th Cir.1983) (*Shores* "extends the protection of rule 10b–5"); Brunelle, *The Shores Case—Expansion of the "Fraud-on-the-Market" Doctrine*, 9 Sec.Regul.Law Journal 390 (1982); Rapp, 39 Wash. & Lee L.Rev. 861 (1982). *See also*, Black, 62 N.C. L.Rev. 435 (1984) (*Shores* represents distinct version of fraud on the market); L. Loss, *"Fraud" and Civil Liability under the Federal Securities Laws* (Federal Judicial Center 1983), p. 58 n. 152 (*Shores* is variation of fraud on the market).

allow a plaintiff to allege that he relied on the integrity of the market prices in purchasing the securities and then shift the burden to the defendant to disprove actual reliance. *Blackie*, 524 F.2d at 907.

■ The *Shores* opinion has been criticized primarily because it extended fraud on the market to new issues in an undeveloped market. In such a setting, it is not necessarily reasonable to presume that misinformation will affect the market price, as information on an undeveloped market does not readily affect market prices and, in the case of new securities, the price will be set by the offeror and underwriters, not the market. *See,* Note, 95 Harv.L.Rev. at 1156–58; Black, 62 N.C.L.Rev. at 453. Moreover, the causal nexus between the misleading information and the plaintiff's decision to purchase is more direct when it affects a security's market price than when the misleading information goes merely to the legitimacy of the issuance of the securities themselves. *See,* Rapp, 39 Wash. & Lee L.Rev. at 886–87.

■ Without impugning the ultimate soundness of the decision in *Shores*, it strikes us as untenable to adopt the fraud on the market theory in a context where its application is most questionable, while precluding its application to transactions in a developed open market, as in this case, where its operation is most justifiable. Moreover, when viewed from this perspective, the language in *Shores* disallowing recovery by a plaintiff where his claim is simply that the price of newly issued securities was adversely affected by a deficient Offering Circular, 647 F.2d at 471, becomes understandable not as a rejection of the general fraud on the market theory, but as a limitation on the theory's application to the unique context of new issue offerings.[8] In such a setting, it is reasonable to allow recovery on the fraud on the market theory where the securities could not have been marketed but for the fraud, because there the information in the Offering Circular and other documents will affect their marketability,[9] but not allow recovery for diminished value because the misinformation will not have an adequate causal nexus to the price. *See T.J. Raney,* 717 F.2d at 1333; Note, Geo.Wash.L.Rev. at 651; Black, 62 N.C.L.Rev. at 453.

We also find support for our conclusion in the reasoning and language of the *Shores* opinion itself. First, the majority relied heavily on the *Blackie* decision and other fraud on the market cases, 647 F.2d at 469, 471 n. 11, without any indication that it would reject the full scope of their holdings when applied to the open market context. Second, the opinion specifically stated that a plaintiff need not show actual reliance on a misleading document where the allegation is "one of a scheme to inflate common stock prices by misleading statements,"[10] *id.* at 472, and contrasted that

---

**8.** The majority in *Shores* noted that the record was unclear as to whether the plaintiff had bought the bonds as part of the primary offering or on the secondary market. 647 F.2d at 467. The majority did not find the distinction to be important, nor do we find it important here. The important fact is not whether the securities were bought on the primary or secondary market, but whether the securities were actively traded so that the market price would be influenced by the available information. *See,* Black, 62 N.C.L.Rev. at 473; Note, 95 Harv. L.Rev. at 1161. Most courts and commentators have elected simply to treat *Shores* as involving newly issued securities and not focused on the primary-secondary market distinction. *See, e.g., T.J. Raney,* 717 F.2d at 1332–33; Note, 95 Harv.L.Rev. at 1153.

**9.** The Ninth Circuit in *Arthur Young & Co. v. United States District Court,* 549 F.2d 686 (9th Cir.1977) similarly concluded that:

> [j]ust as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market to reflect the true value of the securities in which he invests, so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue.

*Id.* at 695.

**10.** The court cited *Rifkin v. Crow,* 574 F.2d 256 (5th Cir.1978), as an example of a case involving "a scheme to inflate common stock prices by misleading statements." 647 F.2d at 472. The *Rifkin* court had favorably discussed the fraud

situation with "a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created as we have here," *id.* The *Shores* court thus recognized that the fact setting before it was of a distinct nature and that there are other situations where "rule 10b–5 is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents which mislead a securities buyer." *Id.* Finally, the language in 10b–5(1) and (3), on which the majority relied to find a cause of action in *Shores*, does not provide any principled basis for not allowing recovery where market prices are fraudulently inflated on the open market.

■ We thus read *Shores* as implicitly approving of the general fraud on the market theory, although limiting its application where new securities are involved to situations where but for the fraud the securities would not have been marketable. The bottom line of *Shores* is that a plaintiff cannot recover if his only claim is that documents on which he did not rely contained misrepresentations; he can recover, however, where the allegation is of fraud "on a broader scale" [11] which affects the market place so that "it would

have availed [the plaintiff] nothing to have read [the misleading documents]." *Id.* at 470–71.

■ Finally, we find independently of the reasoning in *Shores* that this circuit should recognize the fraud on the market theory when applied to class actions alleging that the defendant's deception inflated stock prices in the open market. We agree with the Ninth Circuit that:

> causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

*Blackie*, 524 F.2d at 906 (citations omitted).

Nor do we find, as the defendants argue, that the legislative history of the Securities Exchange Act of 1934 necessitates a different conclusion because Congress intended to make reliance on the misleading statements a prerequisite for recovery.[12] The

---

on the market theory but found it unnecessary to decide whether to adopt it. 574 F.2d at 263–64. The importance of *Rifkin* for our purposes is that the plaintiff's complaint in *Rifkin* was based on inflated market prices due to misstatements and omissions, and not on the marketability of the securities themselves. The majority's approving citation of *Rifkin* thus further indicates that it did not intend to adopt the fraud on the market theory only in cases where the plaintiff alleged that the securities were unmarketable.

**11.** *Shores* is arguably a more narrow holding than *Blackie* in that it requires an allegation of a fraudulent scheme under 10b–5(1), 647 F.2d at 470 n. 8, 472, and not merely a claim that the misleading documents violated 10b–5(2). *See,* Black, 62 N.C.L.Rev. at 453; Note, 95 Harv.L. Rev. at 1153 (*Shores* may require conspiracy among defendants in fraudulently issuing securities). We decline to decide what exactly constitutes fraud on a "broader level" or a scheme or manipulation for the purposes of the opinion in *Shores*. *Cf.* Rapp, 39 Wash. & Lee L.Rev. at 84–85 (*Shores'* requirement of "manipulation"

not very strict). We do note, however, that the majority's concern that the plaintiff allege fraud beyond the "usual 10b–5" claim, 647 F.2d at 468, appears to be directed at ensuring that indirect reliance did in fact exist as it would not have availed the plaintiff to have read the disputed documents. 647 F.2d at 470–71. We further note that the language of 10b–5(3), on which the majority partially relied, does not require a "scheme" but simply "acts, practices and courses of business and conduct which operated as a fraud and deceit . . . ."

**12.** The defendants cite as support the legislative history of Section 18 of the Securities Exchange Act of 1934, which provides a remedy for those injured by misleading statements of material facts in reports filed with the Securities and Exchange Commission. *See* 78 Cong.Rec. at 7701 (April 30, 1934) (statements of Rep. Sam Rayburn); S. Report No. 792, 73d Cong. 2d Sess. 13 (1934). We assume for the purposes of this discussion that sections 10(b) and 18 of the Act are sufficiently analogous to make the legislative history of the latter section relevant to an understanding of section 10(b).

fraud on the market theory as articulated in *Blackie* does not eliminate the need for the plaintiff to show reliance; it simply recognizes that reliance may be presumed where securities are traded on the open market, subject to the defendant proving that the misrepresentations were not material or that the plaintiff's decision to purchase was or would have been unaffected if he had known the true facts. *Blackie*, 524 F.2d at 906. The theory thus actually facilitates Congress' intent in enacting the federal securities law by enabling a purchaser to rely on an expectation that the securities markets are free from fraud. *Id.* at 907.

### IV.

Having concluded that the former Fifth Circuit's decision in *Shores v. Sklar* implicitly approved of the general fraud on the market theory, and that the theory advances the purposes of the Securities Exchange Act of 1934, the district court's order denying the defendants' motion to dismiss the complaint is AFFIRMED.