**In re TEXAS INTERNATIONAL SECURITIES LITIGATION.**

**Civ. No. 84–366–R.**
**MDL No. 604.**

United States District Court,
W.D. Oklahoma.

Jan. 29, 1987.

Stanley M. Grossman, Marc I. Gross and Joseph J. Tabacco, Jr., Pomerantz, Levy, Haudek, Block & Grossman, Harvey Greenfield, New York City, John L. Belt, Oklahoma City, Okl., for plaintiff.

Gene L. Mortensen, Rosenstein, Fist & Ringold, Tulsa, Okl., Roy J. Davis and Judith J. Thompson, Andrews, Davis, Legg, Bixler, Milsten & Murrah, Oklahoma City, Okl., Seyfarth, Shaw, Fairweather & Geraldson, New York City, R. Dow Bonnell, Morrel & West, Inc., Tulsa, Okl., Cohen, Milstein & Hausfeld, Washington, D.C., Thomas A. Wallace, Oklahoma City, Okl., Eugene A. Spector and John F. Innelli, Eugene A. Spector & Associates, P.C., Philadelphia, Pa., for defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

On August 13, 1984, the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred four civil actions pending before the District of New Jersey and an action pending before the Eastern District of New York to this Court for coordination or consolidation for pretrial purposes with five actions pending before this Court. The consolidated complaint, filed on November 9, 1984, alleges that Defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. Specifically, Plaintiffs allege that Defendants made materially misleading statements regarding (i) the scope and extent of the alleged discovery of natural gas at Texas International Company, Inc.'s (TEI) properties at Eloi Bay and Breton Sound (off the Louisiana coast), and (ii) the amount of proved gas reserves subsequently determined to actually exist at Eloi Bay. Plaintiffs further allege that these misleading statements had the intended effect of inflating the price of TEI stock causing damage to those who purchased TEI common stock between January 22, 1981 and January 27, 1984.

Plaintiffs now move this Court to certify this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedures. Plaintiffs bring this action on their own behalf and on behalf of all persons who purchased shares of TEI common stock between January 22, 1981 through January 27, 1984 (the "class period") and who were damaged thereby, excluding Defendants, present or former employees of TEI, and members of Defendant's immediate family (the "class"). After considering the voluminous briefs of the parties and hearing oral argument on this motion, the Court concludes that a class action is appropriate.

## I. FACTUAL BACKGROUND

TEI is a public corporation engaged in the exploration and development of oil and natural gas. Its common stock is traded on the New York Stock Exchange. As of 1980 TEI's proved reserves of natural gas amounted to approximately 104.27 billion cubic feet. [TEI's Form 10K for fiscal year 1980.]

*1981*

The genesis of this litigation was a press release issued by TEI on January 22, 1981. In that release TEI stated that:

> ... it ha[d] an indicated major discovery of natural gas ... in its deep wildcat well being drilled in the Eloi Bay Field, St. Bernard Parish, Louisiana.... [P]reliminary data indicates at least 14 feet of net pay in [the upper] zone ... Interpretation of seismic data by company geophysicists indicates a lower miocene structure covering approximately 6,000 acres.... While company engineers believe that the indicated discovery should more than double Texas International's oil and gas reserves, its management cautions that the full potential will not be known until the two zones are production tested and confirmation drilling on the geophysical structure takes place.

A similar press release dated February 24, 1981, stated that log analysis and wireline formation tests indicated the potential for a major oil and natural gas discovery but continued to caution that the full potential of TEI's wildcat well would not be known until production testing and confirmation drilling on the geophysically defined structure took place. This release also announced that its Eloi Bay exploration well

had logged seven more potentially productive zones of oil and gas. The January 22 and February 24 announcements were reiterated in TEI's 1980 Form 10K and 1980 Annual Report to Shareholders, issued in March 1981. Taking into account a stock split given by TEI during this period, TEI's common stock rose from $45 prior to the January 22 announcement to the equivalent of $89 on February 26, 1981.

Plaintiffs maintain that these releases had an impact on the financial press as evidenced by two articles in the Wall Street Journal ["WSJ"] on January 22, 1981 and February 26, 1981. The WSJ's April 15, 1981 "Heard on the Street" column summarized TEI's reports and attributed the 100% increase in TEI's stock price in the first three months of 1981 to a:

steady flow of exploration news from the company, particularly on its Eloi Bay-Half Moon Lake fields in southern Louisiana. The company's announcement in late February that a 90%-owned well there has "potential for a major oil and gas discovery" was enough to send their stock climbing more than eight points Feb. 25.

The article continues to explain though, that the price of TEI's stock had declined somewhat due to reasons unconnected with the Eloi Bay discovery.

In 1981 TEI issued a series of press releases concerning the progress of the Eloi Bay deep well and an offset well on March 19, July 20, August 5, August 13, September 3, September 10, September 11, October 26, October 28, November 18, and December 17. These releases primarily concerned TEI's difficulties in drilling and specific detailed results of the testing of these wells. The September 10 and 11 releases announced that the casing in the deep test wildcat well had collapsed at approximately 13,530 feet but emphasized that these mechanical problems did not detract from the significance of the apparent discoveries in the Middle and Lower Miocene and Tuscaloosa formation. The September 11 release further stated that "(e)lectric log data, sidewall core analysis

and fluid samples indicate commercial production formation in both formations." Finally, the November 18, 1981 release announced:

Based on information from the two wells and extensive seismic and geophysical work in the areas, independent petroleum engineers have estimated the Eloi Bay-Breton Sound areas have the potential to contain reserves in excess of 1.5 trillion cubic feet of natural gas. Company engineers' and geologists' estimates of the areas reserve potential are well in excess of two trillion cubic feet of gas and, when fully developed, the field could have daily gas production in excess of 200 million cubic feet per day.

This release also announced that a TEI subsidiary had formed an association with the Southeast Louisiana Intra-State Pipeline Corporation to jointly construct an intrastate pipeline from the Eloi Bay and Breton Sound areas to accommodate the Louisiana intrastate market. No cautionary language was included in this release.

*1982–1983*

TEI continued to make statements regarding its Eloi Bay discoveries through 1983. In March 1982, TEI issued its 1981 Form 10–K which stated that TEI's independent petroleum engineers had assigned 33.3 Bcf of proved reserves of natural gas to the Eloi Bay Miocene discovery. This, Plaintiffs allege, accounted for nearly 58% of the increase in TEI's gas reserves for 1981. The 1981 Form 10K also contained a description of proved gas reserves at Phoenix Resources Co.'s ("Phoenix") Connorsville Field in Canada which included proved reserves of natural gas of approximately 72 billion cubic feet. In June 1981 TEI merged with Phoenix, a publicly-held company majority-owned by TEI. The terms of the merger were an exchange of 1.1 shares of TEI common stock for one share of Phoenix common stock.

In March 1983, TEI issued its 1982 Form 10K which, Plaintiffs allege, incorporated the figures of TEI's proved reserves of natural gas for the Eloi Bay and Connorsville fields. However, the 1982 10K provid-

ed no specific proved reserve data for any particular field including the Eloi Bay/Breton Sound discovery or the Connorsville field. The 1982 10K did contain a statement that it considered its Louisiana prospect area to be of high risk because of physical, reservoir and economic conditions. It also stated that it was currently drilling a well in the Breton Sound area, and the results of this well, which was to be completed in 1983, would have an influence on TEI's decision to continue its deep exploration in the offshore Louisiana prospect.

In April 1983, TEI announced that it was discontinuing a deep, expensive exploration program in favor of a more broadly-based program. TEI ceased drilling a deep gas exploration wildcat well in Breton Sound and indefinitely suspended that program in order to, among other things, allegedly reallocate funds to be used to pay down bank debt.

*1984*

On January 27, 1984 TEI issued a press release announcing that it would make a large writedown of its proved gas reserves. The writedown for Eloi Bay and Connorsville totaled approximately 48 Bcf of natural gas. The reserve reductions would have required a writedown of $125 million in booked assets on the company's balance sheet had it not switched from the full cost to the successful efforts method of accounting. These writedowns, when combined with other losses, resulted in an estimated pre-tax loss for 1983 of approximately $153 million. Under the new accounting method, TEI's restated net worth was a negative $95 million. Subsequent to this release, TEI's stock declined nearly 50% from $5.25 per share to $2.75.

*Consolidated Complaint*

Plaintiffs allege that the statements made by TEI in 1981, 1982 and 1983 regarding potential and proved reserves were false and misleading. Specifically, they allege that the announcements in 1981 regarding the potential "major discovery" at Eloi Bay were without any reasonable basis and were intended to mislead investors. Further, they allege, TEI continued to lead the public to believe that a major discovery had been uncovered even after the casing in its exploration well had collapsed (precluding certain testing), and after significant amounts of water were found in those zones that could be tested. They also allege that the amounts of proved natural gas reserves reported at Eloi Bay and Connorsville were materially overstated. Consequently, TEI's assets in 1982 and subsequent financial periods were materially overstated.

Plaintiffs allege that Defendants were motivated to misrepresent and falsely inflate the prospects for and actual existence of proved gas reserves for several reasons. First, in 1981 Defendants Platt and Gist, TEI's Chairman and President, had stock option rights which appreciated in value as TEI stock prices rose. Within two months of the initial 1981 announcements regarding the Eloi Bay "major discovery", they exercised those rights at a profit of over seven million dollars. Second, it inflated its prospects and assets in order to complete the takeover of Phoenix while achieving the most favorable stock exchange ratio in its purchase of Phoenix stock. Finally, the availability of the bank loans to TEI was related to the amount of proved reserves held by TEI. Without inflating reserves, TEI's ability to finance its exploration program would have been significantly impaired.

## II. CLASS ACTION CERTIFICATION

Before the Court can certify a class action under Rule 23 of the Federal Rules of Civil Procedure, the Plaintiff must overcome two hurdles. First, he must demonstrate that each of the prerequisites under 23(a) have been met. Second, he must convince the Court that his action is appropriate under one of three subdivisions of 23(b). Here, Plaintiffs rely on 23(b)(3) which requires the Court to find that common questions of fact or law predominate as to all members of the class and that a class action is superior to alternative ways of conducting the litigation.

A. *Common Questions and Predomi- nance*

The gravamen of Defendants' opposition to certification of the proposed class is that Plaintiffs fail to meet the requirements of 23(a)(2) and 23(b)(3) that the complaint present questions of law or fact common to the class and that these questions predominate over any questions affecting only individual members. They argue that because the alleged misrepresentations are contained in a number of different documents, and because the claims are based on fluctuating events over an extended period, the Plaintiffs who purchased TEI common stock throughout the class period lack commonality with respect to the elements that must be proven in order to establish 10b–5 liability—materiality, scienter, reliance and damages. Defendants further argue that plaintiffs lack commonality because the setbacks TEI suffered were caused by the changing economic fortunes of the oil and gas industry from 1981 to 1984. They reason that the impact of these economic conditions upon the industry over the class period obliterates a finding of commonality, citing *Trattner v. American Fletcher Mortgage Investors*, 74 F.R.D. 352, 356 (S.D.Ind.1976). Finally, defendants contend that even if common issues of law or fact exist, individual issues of proof predominate over common issues thus precluding class certification.

Plaintiffs, on the other hand, contend that common questions of law and fact do exist and, in fact, predominate as to all class members regarding: (1) whether defendants violated the federal securities laws by issuing false and misleading statements; (2) whether the misleading statements were material; (3) Defendants' scienter with respect to the alleged misstatements; and (4) whether Defendants owed a duty to the class members.

1. *Common questions of law or fact.*

Defendants first assert that the Plaintiffs do not present common issues of law or fact with respect to the elements of materiality and scienter. They contend

that whether an allegedly fraudulent misrepresentation or omission was materially misleading must be determined in light of the "total mix" of information available to an investor, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Hassig v. Pearson*, 565 F.2d 644, 649–50 (10th Cir. 1977), and that "materiality" as derived from the "total mix" must be determined on a case-to-case basis according to the fact pattern of each specific transaction, *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 888 (2d Cir.1972). Thus, class certification is precluded, they reason, because the variations in the "total mix" of information available to purchasers of TEI common stock has been in constant flux throughout the class period thereby raising substantial individual questions as to the materiality of the representations allegedly relied upon by any particular plaintiff.

Defendants further argue that proof of scienter cannot be established on a class-wide basis because the basis of Defendants' knowledge of the Eloi Bay prospect— seismic reports, core samples and other geographical data—continuously fluctuated during the class period. Thus, because the scienter element in this case must be viewed as "floating" rather than "fixed", whether such scienter will exist as to any individual plaintiff will directly depend on the information in defendants' possession at the time of that particular Plaintiff's purchase—a question which can only be resolved through individual determination.

Courts faced with similar fact situations have held that where there is such an alleged scheme or continuous course of misconduct, materiality and scienter present common issues. *See Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Further, it is well established that a class action is appropriate in securities fraud cases involving similar or identical misrepresentations even if they are issued at different times. *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23

L.Ed.2d 766 (1969); *Lewis v. Capital Mtg. Investments,* 78 F.R.D. 295 (D.Md.1977); *Aboudi v. Daroff,* 65 F.R.D. 388, 390–91 (S.D.N.Y.1974); *Fischer v. Kletz,* 41 F.R.D. 377, 381 (S.D.N.Y.1966). In fact, courts have generally been quite liberal in certifying class actions in such cases, recognizing that it is the rare case that involves but one fraudulent statement. *See In re Memorex Sec. Cases,* 61 F.R.D. 88, 95 (N.D.Cal.1973).

For example, the court in *Blackie v. Barrack* found common questions in a case involving 45 documents that allegedly overstated inventory over a two year period. The court reasoned:

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit. [citations omitted.].... Those views are consistent with the views of the Advisory Committee on the Rule: "[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action ..." ... The availability of the class action to redress such frauds has been consistently upheld, *see In re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 395–96 (S.D.N.Y.1973), in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws.

524 F.2d at 902–03.

■ These cases persuade the Court that the Plaintiffs' complaint does present common issues of law or fact with respect to the issues of materiality and scienter, and the fact that the alleged misrepresentations occurred at different times and were contained in different documents during the proposed class period do not prevent certification of this class. Plaintiffs have alleged that Defendants engaged in a common and continuous course of conduct by issuing a series of reports and statements containing interrelated and cumulative misleading data to the investing public in order to inflate the price of TEI stock. This course of conduct raises questions common to all those who purchased during the period when the data was being disseminated. These questions include the issues of whether during the period at issue TEI's reported gas reserves were overstated, whether the success of its exploration efforts at Eloi Bay were misrepresented, whether the market price of TEI's common stock was inflated as a result of the actions charged, and whether Defendants knew or should have known that the statements were false or misleading.

### 2. *Predominance and Reliance*

Defendants contend that any common questions which may exist, do not predominate over individual questions of materiality, scienter, reliance and damages.

#### a. *Materiality and Scienter*

■ As to the issues of materiality and scienter, the Court finds that the common questions predominate. The primary issue in this action is whether the Defendants engaged in a continuous scheme to defraud investors by issuing statements allegedly overstating TEI's proven gas reserves causing the market price of TEI stock to rise. When viewed as part of a continuous course of conduct, these statements, because of their interrelatedness present a common question regarding the impact of these statements on TEI's stock price over the class period which predominates over any individual questions which may arise. *See Blackie v. Barrack,* 524 F.2d at 903–04; *Byrnes v. IDS Realty Trust,* 70 F.R.D. 608, 613 (D.Minn.1976). Moreover, the question of materiality of statements issued in the context of an al-

leged common course of conduct is to be measured by an objective standard common to all class members. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 445, 96 S.Ct. at 2130–31; *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 n. 4 (S.D. N.Y.1984). As such, any subjective or individual differences do not defeat class certification. Further, defendants' knowledge of the allegedly fraudulent course of conduct is an issue common to all class members, which does not involve individual issues of proof.

### b. *Reliance*

The cornerstone of defendants' challenge to class certification centers on the issue of reliance. Defendants argue that individual issues of reliance exist and predominate over any common issues that might exist. Plaintiffs, on the other hand, argue that reliance is an issue common to the class and urge the Court to adopt the "fraud on the market" theory which imposes an objective standard for reliance in 10b–5 misrepresentation cases.

■ Traditionally, a private action brought under SEC Rule 10b–5 is predicated on the Plaintiff's actual reliance on the Defendant's deception. Reliance is thus the causal nexus between the Defendant's conduct and the Plaintiff's injury. In traditional cases of misrepresentation or nondisclosure, the reliance requirement is met upon proof that the misrepresentation is a substantial factor in determining the course of conduct which results in loss. Recently, however, courts have adopted the fraud on the market theory, which allows a plaintiff to rely on the integrity of the market rather than requiring direct reliance on the defendant's conduct. Thus, subjective reliance on particular misstatements is no longer a distinct element of proof of 10b–5 claims. *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla., Irr. Fuel Auth.*, 717 F.2d 1330, 1332 (10th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984).

The fraud on the market theory is based on two assumptions. First, that the market price of a company's stock reflects all known material information regarding the company and its business, and that material misinformation, will cause the artificial inflation or deflation of the market price of the stock, and second, that an individual relies on the integrity of the market price when dealing in that stock. Thus, by artificially inflating the price of the stock, the misrepresentations defraud purchasers who rely on the price of the stock as an indication of the stock's value. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations. In both cases, defendants' fraudulent statements or omissions cause plaintiffs to purchase stock they would not have purchased absent defendants' misstatements and/or omissions.

■ At its simplest, the theory requires only that a plaintiff prove purchase of a security between the time the misrepresentations were made and the time the truth was revealed, that a material misrepresentation was made concerning the security by the defendant which resulted in an artificial change in price, and that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock. *Levinson v. Basic, Inc.*, 786 F.2d 741, 750 (6th Cir.1986); *T.J. Raney & Sons*, 717 F.2d at 1332; *see also* Note, *The Fraud-on-the-Market-Theory*, 95 Harv.L.Rev. 1143 (1982).

Defendants argue that this Court should not adopt the fraud on the market theory with respect to securities traded on the open market. Their argument is twofold. First, they argue that the Tenth Circuit's adoption of this theory in *T.J. Raney & Sons* should be limited to its facts and applied only to newly issued securities and not extended to securities traded on the open market. Second, they contend that precedent in this circuit requires that in a misrepresentation case, affirmative proof of individual reliance is required, citing *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir.1976), *cert. denied* 430 U.S. 955, 97

S.Ct. 1600, 51 L.Ed.2d 805 (1977). The Court disagrees.

First, the fraud on the market theory has been consistently applied in cases in which the Defendants made public, material misrepresentations with respect to both newly issued securities and securities traded on the open market. *Levinson v. Basic, Inc.,* 786 F.2d 741, 750–51 (6th Cir.1986); *Peil v. Speiser,* 806 F.2d 1154 [Current] Fed.Sec.L. Rep. (CCH) ¶ 93,006 at 94,942–94,943 (3d Cir.1986); *Lipton v. Documation, Inc.,* 734 F.2d 740 (11th Cir.1984), *cert. denied,* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irr. Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir. 1981), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982), *vacated as moot sub nom, Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Blackie v. Barrack,* 524 F.2d 891, 905–908 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *See also, Harris v. Union Elec. Co.,* 787 F.2d 355, 366–67 (8th Cir.1986). Moreover, other district courts in this circuit have also adopted this theory for securities traded on impersonal, actively traded markets. *In re Home-Stake Production Co. Securities Litigation,* 76 F.R.D. 351, 370–73 (N.D. Okla.1977); *Texas International Securities Litigation,* M.D.L. Docket No. 604 (D.Colo. March 19, 1986).[1]

Second, while the holding in *T.J. Raney & Sons* was confined to the limited situation involving newly issued securities traded on an undeveloped market, it demonstrated the Tenth Circuit's understanding and acceptance of the economic basis for the fraud on the market theory. The reasoning in *T.J. Raney & Sons* and its discussion and approval of cases applying this theory to securities traded in an impersonal, efficient market, indicate that given the opportunity the Tenth Circuit would extend the application of this theory to securities traded on the open market. It further demonstrates the Tenth Circuit's commitment to a flexible and progressive interpretation of the securities laws to fairly effectuate their remedial purpose. *T.J. Raney,* 717 F.2d at 1333; *Clegg v. Conk,* 507 F.2d 1351, 1361 (10th Cir.1974).

Likewise, this theory finds its greatest justification when applied to class actions alleging fraudulent misrepresentations or omissions that affected security prices on a developed open market. *Lipton v. Documation, Inc.,* 734 F.2d at 745. It facilitates Congress' intent in enacting the federal securities laws by enabling a purchaser to rely on an expectation that the securities markets are free from fraud. *Id.* at 748.

In this context, it is reasonable to assume that misinformation disseminated into the marketplace will affect the market price. It is also reasonable to allow a plaintiff to allege that he relied on the integrity of the market prices in purchasing the securities. *Lipton v. Documation, Inc.,* 734 F.2d at 745–46; *Blackie v. Barrack,* 524 F.2d at 907. Therefore, proof of subjective reliance on particular misrepresentations is unnecessary to establish a Rule 10b–5 claim.

Accordingly, this Court adopts the fraud on the market theory in the open market context and applies it in this case. Plaintiffs, therefore, need not prove direct reliance on Defendants' alleged misrepresentations, but can satisfy their burden of proof on the element of causation by showing that Defendants made material misrepresentations. If Plaintiffs make such a

---

1. Defendants cite two cases in which district courts in this circuit refused to adopt the fraud on the market theory. *Oklahoma Publishing Co. v. Standard Metals Corp.,* 541 F.Supp. 1109 (W.D.Okla.1982); *Fausett v. American Resources Management Corp.,* 542 F.Supp. 1234 (D.Utah 1982). These cases were all decided prior to *T.J. Raney* in which the Tenth Circuit adopted the fraud on the market theory. Thus, in light of *T.J. Raney,* this Court does not find them persuasive.

showing, the Court will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the Plaintiffs to purchase the stock. The Defendants may, of course, assert appropriate defenses, including the defenses that the market did not respond to the alleged misrepresentations or that the Plaintiffs would have purchased the stock even if they had known of them. In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock as a reflection of its value. The likelihood that Plaintiffs' purchase of stock can be causally connected to Defendants' alleged misrepresentations is so strong that it is logical to presume reliance and to shift the burden of rebutting that presumption to Defendants. *See Peil v. Speiser,* 806 F.2d 1154 [Current] Fed. Sec.L.Rep. (CCH) ¶ 93,006 at 94,942–943 (3d Cir.1986); *In re LTV Securities Litigation,* 88 F.R.D. 134, 142 and 145 (N.D.Tex. 1980). This implied-in-law reliance common to all class members is a substitute for actual, particularized reliance by class members and thus perforce "predominates" over questions of individual reliance.

Therefore, in light of the above, the Plaintiffs have satisfied the 23(a)(2) and 23(b)(3) requirements with respect to the issue of reliance.

### c. *Damages*

Finally, Defendants argue that the necessity of adjudicating individual questions of damages will render this case unmanageable as a class action. Courts have consistently rejected the argument that individual damages questions prevent class action certification. *See, Blackie v. Barrack,* 524 F.2d at 905; *Koenig v. Smith,* 88 F.R.D. 604, 609 (E.D.N.Y.1980); *Lewis v. Capital Mtg. Investments,* 78 F.R.D. at 306–07. This interpretation of Rule 23(b)(3) is consistent with the Advisory Committee Comments accompanying the 1966 amendment, which stated that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." *Lewis v. Capital Mtg. Investments,* 78 F.R.D. at 306–07.

Moreover, courts have recognized that the computation of damages need not be mathematically exact so long as it is reasonably based. *See Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *Meyers v. Moody,* 693 F.2d 1196, 1215 (5th Cir.1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). Proof of damages can be demonstrated on a class-wide basis by the use of a generalized or formulary approach and, in fact, in similar class action cases, various formulas to determine damages have been presented to juries. Once the jury determines the formula or daily amount of per share damages, the determination of damages sustained by individual class members usually involves only the mechanical task of applying a formula to the date and amount of each individual's purchase. *Lewis v. Capital Mtg. Investments,* 78 F.R.D. at 307. *See also In re Home-Stake Production Co. Securities Litigation,* 76 F.R.D. at 373; *Newberg on Class Actions* (2d), § 22.52 at 105.

If, however, it becomes evident that intra-class conflicts exist, and that a distinction must be drawn between those who purchased at different times, the Court may divide the class into sub-classes. *See* Fed.R.Civ.P. 23(c)(4); *Green v. Wolf Corp.,* 406 F.2d at 299. However, at this point, the Court sees no reason to divide the class into subclasses.

### B. *23(a) Requirements and Superiority*

Rule 23(a) prescribes four prerequisites for maintaining a class action. First, the class must be so numerous that joinder of all members is impracticable. Second, there must be questions of law or fact common to the class. Third, the claims or defenses of the class representative must

be typical of the claims or defenses of the class. Finally, the representative parties must fairly and adequately protect the interests of the class.

### 1. *Numerosity*

█ Plaintiffs assert and Defendants do not contest, that TEI stock was actively traded during the class period. Plaintiffs contend that as of November 7, 1983, there were approximately 27,489,937 shares of TEI common stock outstanding held by approximately 18,000 shareholders. Defendants do not dispute these figures. The fact that there may be shareholders numbering in the thousands is sufficient to satisfy the requirement that joinder be impracticable. *See Green v. Wolf Corp.*, 406 F.2d at 298.

### 2. *Typicality*

█ Although the precise meaning of the term typicality is unclear, most courts have interpreted it as requiring that the class representative's claims present issues common to the class and that his position concerning those issues is not antagonistic to the positions of the other class members. *Lewis v. Capital Mtg. Investments*, 78 F.R.D. at 301. The typicality element only requires a comparison of the claims or defenses of the representative with the claims or defenses of the class. *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 270 (10th Cir.1975). It does not require that the claims of the class representative be "co-extensive with" or "identical to" those of other class members. The requirement of typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class. *In re Four Seasons Securities Laws Litigation*, 59 F.R.D. 667, 681 (W.D.Okla.1973) *rev'd on other grounds*, 502 F.2d 834 (10th Cir.), *cert. denied*, 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974).

Defendants assert that the proposed class representatives' claims cannot be typical of each other or of the claims of the proposed class because (1) they purchased TEI stock in 14 separate time frames and (2) each made their investment decision based upon different information provided by different sources—the *Wall Street Journal*, Annual Reports, brokers' advice, press releases, *Barrons*, the Dow Jones wire, etc. Thus, Defendants argue that because there is not one proposed class representative who will be able to represent the proposed class for the whole of the defined class period, class certification is inappropriate.

█ While Defendants' arguments may have some initial appeal, they contain some fundamental flaws. First, the fact that the Plaintiffs purchased TEI stock at different times does not make their claims atypical. The focus that is important in determining this class action motion is the course of conduct of Defendants, not the course of action of the stock. *See Aboudi v. Daroff*, 65 F.R.D. at 391.

Plaintiffs' claim is that Defendants issued a series of misleading statements wherein they continuously overstated TEI's proved gas reserves and the success of their exploration efforts at Eloi Bay in order to inflate the price of TEI stock; that these statements were interrelated and cumulative; that they were all integral elements in the fraudulent activities and practices; and that they represented a scheme and continuous course of conduct in violation of § 10(b). To properly plead such a scheme and course of conduct, Plaintiffs need not show any relationship between the alleged misstatements of any one time period and the market activity of another. *Aboudi v. Daroff*, 65 F.R.D. at 391. Thus, for purposes of Rule 23(a)(3) the alleged scheme and common course of fraudulent conduct on the part of Defendants raises questions which are typical of the entire class regardless of when a particular Plaintiff purchased his or her stock. *See Byrnes v. IDS Realty Trust*, 70 F.R.D. at 612; *Green v. Wolf Corp.*, 406 F.2d at 299–300; *Aboudi v. Daroff*, 65 F.R.D. at 391–92.

■ Second, Defendants' contention that Plaintiffs' claims are atypical because they relied on different information from different sources is similarly without merit. Plaintiffs' claims meet the typicality requirement if they arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and the claims are based on the same legal theory. *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 831 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213, 219 (D.Colo.1970), *aff'd,* 466 F.2d 1374 (10th Cir.1972) (class decertified without opposition because joinder was practicable.) The fact that varying fact patterns may underlie individual claims is insufficient to defeat the typicality requirement if it is alleged that the same unlawful conduct was directed at Plaintiffs and those they represent. *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. at 219.

■ Here Plaintiffs allege that Defendants committed the same unlawful acts by the same method—public dissemination of false and misleading information in a continuous course of conduct in violation of § 10(b)—against the entire class. The source of the information relied upon by the Plaintiff purchasers—whether direct or indirect—is irrelevant because the information contained in each source deals with essentially the same information—the amount of TEI's proved gas reserves and the success of its exploration efforts at Eloi Bay. *See Green v. Wolf Corp.,* 406 F.2d at 299; *In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 139 (D.N.J.1984). Therefore, Plaintiffs' claims are typical.

Moreover, Plaintiffs' claims do not appear to be antagonistic to, or even distinguishable from, those of the other members of the class. As did all other members of the class, Plaintiffs purchased their shares allegedly relying on the claimed misstatements and the manipulated market price.

Finally, as to Defendants Keplinger & Assoc., Inc. and Raymond F. Kravis & Assoc., Inc., independent petroleum engineering firms hired at different periods by TEI in connection with the Eloi Bay exploration efforts, Plaintiffs allege that they were part of the scheme and continuous course of business conduct engaged in to allegedly defraud Plaintiff investors. At this stage of the proceedings, the Court sees no reason to deny class certification because those Defendants were not involved during the entire class period. If, however, it develops that substantial conflicts exist, subclasses could be created pursuant to Rule 23(c)(4).

### 3. *Adequate Representation*

■ Defendants do not contend that, the other Rule 23 requirements being satisfied, Plaintiff representatives will not fairly and adequately protect the interests of the class.

The requirement that Plaintiffs adequately represent the class has two components. First, the interests of the Plaintiffs and the other members of the class must not be antagonistic. Second, it must appear that Plaintiffs' attorneys are qualified and experienced, and will vigorously prosecute the action. *In re Home-Stake Production Co. Securities Litigation,* 76 F.R.D. at 367. The Court in its discussion of Rule 23(a)(3) has already determined that the interests of the Plaintiffs and the other class members coincide.

The second requirement is also met. Plaintiffs' counsel allege and there is no reason to doubt them, nor have Defendants disputed, that they are well experienced in prosecuting securities class actions. Moreover, the performance of Plaintiffs' counsel thus far leaves the Court with no doubt that Plaintiffs' claims will be vigorously and satisfactorily prosecuted throughout the course of this litigation. The essential ingredients of adequate representation are thus demonstrably present in the instant case.

### 4. *Superiority*

■ As a final matter, the Court also finds that plaintiffs meet the superiority

requirement of Rule 23(b)(3). A resolution of these common issues in a single proceeding will both minimize the expenditure of judicial resources and result in a single resolution of common issues binding on all class members. Moreover, joinder and other procedural mechanisms are impracticable due to the number of potential plaintiffs in this class.

### III. CONCLUSION

In summary, Plaintiffs have adequately shown that the potential class numbers are too numerous for individual joinder to be practicable; that there are questions of law and fact common to all members of the class; that these common questions will predominate over any individual issues of damages; and that they will fairly and adequately represent the interests of the absent class members in establishing liability on the part of the Defendants. If any conflicts arise between the class members they can be remedied through subclassing, Fed.R.Civ.P. 23(c)(4), or if necessary, the class can be decertified.

In view of the foregoing, the Court concludes that a class action under Fed.R. Civ.P. 23(b)(3) is superior to other available matters for the fair and efficient adjudication of this controversy.

Accordingly, IT IS HEREBY ORDERED:

1. That plaintiffs' motion to certify a class action for all persons who purchased shares of TEI common stock between January 22, 1981 through January 27, 1984 and who were damaged thereby, excluding defendants, present or former employees of TEI, and members of defendants' immediate family, is GRANTED and the class conditionally certified pursuant to Rule 23(c)(1);

2. That Plaintiffs are conditionally certified pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, as class representatives in this class action;

3. That Plaintiffs bear the burden, including the cost, of notifying the members of the class; and

4. That Plaintiffs submit a proposal to the Court within thirty (30) days from the date of this opinion outlining the procedure for conducting discovery to determine the identity and address of each member of the class, the time frame for conducting that discovery, the procedure for providing notice in conformance with Rule 23(c)(2) and the contents of that notice.